*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0239p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

        *Plaintiff-Appellee,*

    *v.*

CAROLYN SUE DAVIS (06-5073) and OTIS DAVIS (06-5074),

        *Defendants-Appellants.*

Nos. 06-5073/5074

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Pikeville.
No. 05-00012—Danny C. Reeves, District Judge.

Argued: February 1, 2007

Decided and Filed: June 22, 2007

Before: KENNEDY, BATCHELDER, and CLAY, Circuit Judges

---

## COUNSEL

**ARGUED:** Joseph R. Lane, PILLERSDORF, DeROSSETT & LANE, Prestonsburg, Kentucky, Brenda Popplewell, BRENDA POPPLEWELL, ATTORNEY AT LAW, Somerset, Kentucky, for Appellants. Erin J. May, ASSISTANT UNITED STATES ATTORNEY, Lexington, Kentucky, for Appellee. **ON BRIEF:** Ned B. Pillersdorf, PILLERSDORF, DeROSSETT & LANE, Prestonsburg, Kentucky, Janet L. Stumbo, Van Lear, Kentucky, for Appellants. Erin J. May, Charles P. Wisdom, Jr., ASSISTANT UNITED STATES ATTORNEYS, Lexington, Kentucky, for Appellee.

---

## OPINION

---

    KENNEDY, Circuit Judge. Carolyn Sue Davis (hereinafter "Ms. Davis") and Otis Davis (hereinafter "Mr. Davis") (collectively "appellants") appeal their August 25, 2005 convictions for twelve counts of aiding and abetting Medicare fraud, in violation of 18 U.S.C. § 1347(1) and (2), and one count of obstruction of a criminal investigation involving federal healthcare offenses, in violation of 18 U.S.C. § 1518(a). Ms. Davis asserts that the trial court erred in (1) excluding evidence that oxygen received by certain miners named in the indictment was medically necessary, (2) limiting the cross-examination of a prosecution witness with regard to bias, (3) handling an exhibit in a way that emphasized certain portions of the material, and (4) responding to a jury question with supplemental instructions. Mr. Davis asserts that the trial court erred by (1) permitting

1

him to proceed throughout trial without separate counsel, and (2) denying him a directed verdict on the twelve counts of aiding and abetting health care fraud. For the reasons that follow, we affirm the district court's convictions of Ms. Davis and Mr. Davis on all counts.

## BACKGROUND

On August 25, 2005, a jury convicted Carolyn Sue Davis and her husband, Otis Davis, on twelve counts of aiding and abetting Medicare fraud in violation of 18 U.S.C. § 1347(1) and (2), with each of the twelve counts based on claims filed on behalf of particular named patients, and one count of obstruction of a criminal investigation involving federal healthcare offenses, in violation of 18 U.S.C. § 1518(a). These charges stemmed from the Davis's orchestration of and participation in a scheme to supply oxygen to coal miners suffering from black lung disease. Ms. Davis was instrumental in the founding of the Kentucky Black Lung Association (hereinafter "KBLA"), an organization designed to help miners obtain black lung benefits, as well as other goods and services they might need in order to live with the disease. She would send miners that were associated with the KBLA to Dr. Raghu Sundaram, a pulmonary doctor, for the requisite medical testing. Dr. Sundaram established a special clinic for individuals associated with the KBLA, at which Ms. Davis volunteered. Dr. Sundaram was also named in the indictment as an aider and abetter but was acquitted at the joint trial.

From Dr. Sundaram's office, the patients were directed to J&J Medical, a durable medical equipment (hereinafter "DME") company created and owned by Mr. Davis, a retired coal miner, for their oxygen supplies. A DME company is paid by Medicare for supplying equipment by submitting a certificate of medical necessity (hereinafter "CMN"), created electronically from a computer-generated form and electronically submitted to the insurer, here, Medicare contractor Palmetto GBA, which pays upon its processing of the claim. A CMN contains three sections with instructions as to the party to complete each portion. The middle portion, Section B, requires someone from the doctor's office to provide the patient's blood-oxygen levels. The form explicitly stipulates that the supplier of the health care product is not to fill out this medical information. At the bottom of the form, the doctor is to sign and confirm that the medical information is true and accurate.

The investigation of J&J Medical began in March of 2002, when a Health and Human Services investigator discovered information about questionable practices of the company in relation to Dr. Sundaram. Examination revealed that the vast majority of J&J Medical clients were referrals from Dr. Sundaram. It also indicated that Ms. Davis, as a volunteer at Dr. Sundaram's clinics, had special access to the doctor's patients, their files, and their prescriptions. During an interview with the investigator, and later at trial, Dr. Sundaram unequivocally stated that he had never authorized anyone to sign prescription forms for him, nor had he authorized anyone to sign a CMN for him.

Yet at trial, witnesses from the offices of Dr. Sundaram and J&J Medical testified that they personally observed Ms. Davis doctoring prescriptions and forging the doctor's signature on them, as well as forging his signatures and including data on CMNs without any paperwork to ensure that the data required for Medicare reimbursement was accurate. Connie Webb, who volunteered in Dr. Sundaram's office, testified that Ms. Davis directed her to go to J&J Medical on at least four or five occasions to sign the doctor's name to CMNs. Upon completion of the forms, Webb would have someone at the J&J Medical office supply her with copies of the forms, which she could insert into the patient's charts upon returning to the doctor's office. Letha Justice, Ms. Davis's son's cohabitating girlfriend whom Ms. Davis paid for her work at Dr. Sundaram's clinic, testified that she went to the Davis's home, where, at Ms. Davis's direction, she wrote figures in Section B of the CMNs, though Ms. Davis did not consult any patient files when dictating the numbers to fill in. Ms. Justice recounted that she filled in data on more than a hundred CMN forms per Ms. Davis's instructions. Phyllis Bennett Blair, a billing agent for J&J Medical, recalled witnessing Ms. Davis herself signing Dr. Sundaram's name to CMN forms, even practicing duplicating his signature. Ms.

Blair and Margaret Lawson, another billing agent for J&J Medical, both testified to refusing Ms. Davis's requests that they, too, participate in fraudulent completions of CMNs.

Multiple witnesses also testified as to the falsification of "check-off" sheets, forms used in Dr. Sundaram's office, but not legally required, as a measure to ensure patients had a choice of medical suppliers. Ms. Blair, Amanda Tibbs, a medical billing agent working in the same building as J&J Medical, and Jennifer Akers, Ms. Davis's daughter and an employee of J&J Medical, recounted at trial that Ms. Davis directed a group at the J&J Medical office to fill out "check-off" sheets, sign them with the patients' names, copy them, and put them in patient files.

In addition to recalling instances of fraud that they witnessed in the course of the Medicare fraud scheme itself, many testified as to the various ways the Davis's attempted to cover up their misdeeds when they became aware of the investigation. Ms. Blair testified that Ms. Davis offered to give her fifteen dollars to remove "all of the prescriptions and anything that would incriminate her." Upon her refusal, she stated that Mr. Davis ultimately removed the items. Jennifer Akers and her husband both took the stand and testified that Mr. and Ms. Davis together came to their house to request that they hide a garbage bag containing improperly completed CMNs and prescriptions at various stages of completion.

At the conclusion of the trial, the jury found Ms. Davis and Mr. Davis guilty on all twelve counts of violating 18 U.S.C. § 1347(1) and (2) as well as the single count of obstruction of justice in violation of 18 U.S.C. § 1518(a). Upon conviction for health care fraud and obstruction of justice, Ms. Davis was sentenced to a term of imprisonment for 60-months, and Mr. Davis received a sentence of 36-months' imprisonment. Both received three years of supervised release, a special assessment of $100.00 on each count, and direction to make restitution in the amount of $171,933.00, imposed jointly and severally on Ms. Davis and Mr. Davis. Here, they each appeal their conviction on counts one through twelve, based on various errors allegedly committed by the trial court.

## ANALYSIS

### I.    *Defendant Carolyn Sue Davis*

A.     Defendant Carolyn Sue Davis argues on appeal that the trial court erred by excluding evidence that oxygen received by the miners was medically necessary, asserting such evidence to be relevant to whether any alleged misrepresentations were material. In essence, Ms. Davis posits that "those paperwork mistakes, if any, only resulted in payments of claims that were proper rather that any false statements" of medical necessity where none existed. Four of the miners named in the first twelve counts testified that they did need oxygen and continued to receive oxygen. Ms. Davis suggests that, during her trial on charges of health care fraud, she should have been permitted to introduce evidence that the eight others also actually had a valid basis for receiving oxygen, in an effort to prove that Medicare only paid for treatment that was medically justified, even if the CMNs themselves were not completed with perfect accuracy and honesty. The trial court's decision to admit or exclude evidence is within the discretion of the trial judge and will be reviewed only for abuse of discretion. *In re Air Crash Disaster*, 86 F.3d 498, 526 (6th Cir. 1996).

Section 1347 states that one commits health care fraud when he:

knowingly and willfully executes, or attempts to execute, a scheme or artifice—
    (1) to defraud any health care benefit program; or
    (2) to obtain, by means of false or fraudulent pretenses,
    representations, or promises, any of the money . . . owned by . . . any
    health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services . . . .

The only case either party cites to interpret the meaning of the statute is *Piacentile v. Wolk*, an unpublished case from the Eastern District of Pennsylvania, holding that "any information added [to a CMN], without authorization, by an individual other than the physician signing the CMN" is false. No. 93-5773, 1995 WL 20833, at *2 (E.D. Pa. Jan. 17, 1995). As such, the medical necessity of the product or service ultimately obtained is not the crux of the issue, but rather the total integrity of the CMN forms. We are persuaded that this interpretation of § 1347 is most appropriate.

On its face, 18 U.S.C. § 1347 defines health care fraud as including the obtaining of health care benefit program moneys "by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1347(2). It is true that the district judge instructed the jury that, "to find a defendant guilty of health care fraud, you must find that . . . the defendant . . . execute[d] . . . a scheme . . . to obtain by means of *materially* false or fraudulent pretenses . . . any money . . owned by . . . a health care benefit program" (emphasis added). Ms. Davis would like us to interpret this "materiality" requirement to mean that the government must prove that her misrepresentations actually induced Palmetto GBA to pay the claims presented. In other words, she argues, if the miners were legitimately entitled to the oxygen under Medicare, inaccurate and dishonest completion of the CMN alone could not support a guilty verdict. However, were we to interpret materiality the way that Ms. Davis suggests, we would essentially write § 1347(2) out of the statute entirely. Already, 18 U.S.C. § 1347(1) criminalizes conduct that "defraud[s] a health care benefit program." We interpret the statute to give each section independent meaning.

Section 1347(2) preserves the integrity of the claims procedures that Medicare relies upon for the provision of medically necessary products. Falsifying medical test results when completing the CMN compromises the proof of eligibility for medical products that the form exists to establish, and forging a doctor's signature on the CMN removes responsibility for the veracity of the data included from the individual, which the government sought to have certified. To ensure the reliability of the Medicare claim system and to avoid actual losses, §1347(2) criminalizes interference with this procedure in all cases, even in those which have not resulted in benefits to undeserving patients.

Applying the statute to the facts of the case at hand, the jurors unanimously found that Ms. Davis engaged in health care fraud under §1347(1) and §1347(2), as indicated on the special verdict forms. Even if the patients at issue were entitled to oxygen, the prosecution presented a huge body of evidence to indicate that Ms. Davis filled out parts of the CMN paperwork to be completed by the doctor without the doctor's permission and that Ms. Davis was not in possession of the records necessary to accurately complete the test results information required for the patients' CMN forms. In *United States v. Lucien*, the Second Circuit interpreted "[t]he broad language of § 1347 [to] show[] that Congress intended for this statute to include within its scope a wide range of conduct so that all forms of health care fraud would be proscribed, regardless of the kind of specific schemes unscrupulous persons may concoct." 347 F.3d 45, 51 (2d Cir. 2003). Though the case at bar is not the paradigm health care fraud case, consisting of claims for pharmaceuticals or supplies in the obvious absence of medical need, the statute is broad enough to encompass Medicare claims submitted with fraudulent data, irrespective of real patient need.

The judge's instructions to the jury make it clear that proof of patient need would not aid the jury in rendering its verdict. Before dismissing the jury to deliberate, the judge explained to them that "any false statements or assertions that concern a material aspect of the matter in question that were either known to be untrue when made or made with reckless indifference to their truth" would constitute "false or fraudulent pretenses, representations, or premises." He also emphasized that "[i]t [was] not necessary for the government to prove that the health care benefit program suffered any financial loss." As the jury was not tasked with determining whether the Medicare claims made were

ultimately unnecessary, but instead had to determine whether the claims filed made false representations, the medical-necessity evidence was irrelevant to the conviction under § 1347 and its exclusion was well within the discretion of the trial judge.

B.      Ms. Davis also asserts that the trial court improperly limited the cross-examination of Connie Webb by not allowing Davis's counsel to question Ms. Webb regarding her alleged extramarital relationship with Dr. Sundaram. We review the trial court's disposition of this issue for abuse of discretion. *United States v. Bistrup*, 449 F.3d 873, 882 (8th Cir. 2006). While bias is always relevant with regard to a witness's credibility, it remains the case that a trial court can opt to exclude evidence that is marginally relevant and highly prejudicial. *Id.* We cannot find that the trial court abused its discretion in limiting cross-examination in this case, given that (1) counsel introduced no basis for defendant's legal theory that the witness believed she had authority to sign for Dr. Sundaram based on their romantic relationship and (2) any questions about an alleged extramarital affair would have been highly prejudicial to Dr. Sundaram's defense.

C.      Ms. Davis further alleges that the district court erred in the way that it permitted trial presentation of Exhibit 13, a black bag containing various documents, including CMNs and prescriptions, that afforded undue emphasis to certain incriminating documents. Ms. Davis takes issue with the fact that the court allowed some of these documents to be seen by the jury in a grouped fashion and that some of the documents were marked with labels. This court reviews the manner in which evidence was presented to a jury for abuse of discretion. *United States v. Talley*, 194 F.3d 758, 765 (6th Cir. 1999). In this case, the trial court also allowed the jury to view the entire contents of the bag, including several non-incriminating documents. The judge permitted counsel to keep the labels, which were applied following a handwriting expert's analysis, on the documents when the expert herself was unable to testify at trial. Even if the district court was in error in allowing the jury to view the evidence in this grouped and labeled manner, the rest of the proceedings rendered the error harmless. A witness for the United States testified that he had pulled various documents, grouping them in the course of the investigation, and that the stickers on the documents had no significance. This testimony was sufficient to cure any potential prejudice. *See United States v. Smith*, 419 F.3d 521, 529-30 (6th Cir. 2005) (indicating that a witness's testimony can help to put an exhibit in context, reducing potential prejudice resulting from the introduction of an exhibit).

D.      Ms. Davis asserts that the district court's response to a question posed by the jury unduly emphasized an aspect of the case that was harmful to her. This court reviews a district court's "actions in responding to questions from the jury" for abuse of discretion. *United States v. August*, 984 F.2d 705, 712 (6th Cir. 1992). During deliberation, the jury submitted a written question, asking, "If the information on the CMN is factually correct but the signature is forged, is the document fraudulent?" The trial court responded by instructing the jury that "[a] forged signature may be considered by you as evidence of fraudulent intent, which is one of the elements to be proven in Counts 1 through 12. You should consider this instruction, together with all other instructions given relating to Counts 1 through 12." We find that the district court's additional instruction was responsive to the jury's specific concern while prudently refocusing the jury on the instructions and evidence as a whole. The government correctly asserts that this instruction did not meet the "high standard" required for reversal of a conviction. *United States v. Khalil*, 279 F.3d 358, 367 (6th Cir. 2002).

## II.      *Defendant Otis Davis*

A.      Otis Davis first asserts that the district court erred by allowing him to be represented jointly by the same attorney who represented his wife. This court has previously found that "[a] defendant may make a knowing, intelligent, and voluntary waiver of [his] right to conflict-free counsel, and a defendant has a Sixth-Amendment right to counsel of [his] choice." *United States v. Straughter*, 950 F.2d 1223, 1234 (6th Cir. 1991). In this case, the district court devoted considerable

time to the discussion of joint-representation and the conflicts that can result. The court advised Ms. and Mr. Davis of many potential hazards of joint representations, questioned each defendant individually "to confirm that each . . . had a chance to think about and consider those issues and to discuss those matters with [their] attorney," and advised both defendants that, if any conflict should occur, it should be brought to their attorney's attention. It was after these discussions that Mr. Davis consented to joint representation, indicating that the waiver he signed was knowing, independent, and voluntary. This court must honor such waivers "in the absence of compelling circumstances." *United States v. Reese*, 699 F.2d 803, 805 (6th Cir. 1983). No such circumstances exist here. Rather, this case resembles the scenario in *United States v. Gullett*, where this court determined that the defendant suffered no prejudice as a result of dual representation despite the defendant's minor role as compared with his co-defendant. 713 F.2d 1203, 1214 (6th Cir. 1983). Defendant cannot, after offering such a waiver, now retract it as a means to escape an unwanted verdict.

Mr. Davis now argues that "when the waiver occurred, no discovery had been asked for or received by the defense and thus any waiver executed was premature in light of the evidence as it was developed at trial." However, as the trial court explicitly instructed the defendants to report to their attorney any conflicts that should arise, and defendants accepted this responsibility, Mr. Davis cannot complain to the court regarding any fallout from his failure to do so.

B.        Mr. Davis asserts that the trial court erred in denying his motion for a directed verdict acquitting him of the twelve counts of health care fraud.[1] When this court reviews a conviction for sufficiency of the evidence, we do not conceptualize our role as that of a jury, deciding the case anew, but rather we review the jury's verdict subject to a highly deferential standard. As the Supreme Court has explained:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). (citations omitted)

Mr. Davis asserts that any participation in the scheme on his part was unknowing and that there is no evidence that he knew the claims were fraudulent when submitted. As one federal district court noted when interpreting 18 U.S.C. § 1347(2), "'[b]ecause it is difficult to prove intent to defraud from direct evidence, a jury may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom.' Intent can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *United States v. Cooper*, No. 02-40069-01/02/03-SAC, 2004 U.S. Dist. LEXIS 3470, at *12-13 (D. Kan. Feb. 10, 2004) (quoting *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003). Upon review of the evidence, we find that a reasonable juror would have sufficient basis to find Mr. Davis guilty.

The record provided ample support for the jury to make the inference that Mr. Davis had the requisite knowledge and fraudulent intent to be a participant in the health care scheme, by virtue of the repeated occurrence of fraudulent activities, spearheaded by his wife, at his place of business and

---

[1] Defendant concedes that "there was sufficient evidence to proceed on the obstruction charge, based on the act of cleaning out the desk and being present when the check off sheets were prepared." App't Otis Davis's Br. at 25.

his home. Though testimony on Ms. Davis's involvement with J&J Medical dominated the trial, her participation in the company does not negate her husband's work with it. Mr. Davis was the sole owner of J&J Medical. He usually wrote the checks for the corporation, hired and fired employees, and frequently went to the J&J Medical office, where many fraudulent activities occurred. Ms. Webb testified that she went to J&J Medical on at least four or five occasions to sign Dr. Sundaram's name to CMNs and obtain copies of the forms so that she could insert them into patient files upon her return to the doctor's office. Ms. Blair recalled on the stand that Mr. Davis was present during a session at J&J Medical at which staff signed check-off sheets, copied them, and placed them into patient files. Ms. Blair recounted that while Ms. Davis directed the operation, Mr. Davis stood by as "it was going on right in front of him" and brought food for the participants. Ms. Akers testified to forging the miners' signatures on the check-off sheets at her mother's direction, and she also recalled that Mr. Davis "came in and out that day" and stated that "everybody that was in there knew what was going on." Even at home, Mr. Davis could have acquired knowledge of the scheme due to the fraudulent acts that occurred there. Ms. Justice testified that she had gone to the Davis's home on multiple occasions to fill in CMN forms per Ms. Davis's instructions.

Additionally, the record contains testimony on the part of a number of witnesses that implicates Mr. Davis in cover-up operations to destroy evidence, from which the jury could infer that he sought to conceal his own wrongful acts. Ms. Blair testified that, when she refused Ms. Davis's offer to pay her fifteen dollars to "go in her office and remove all of her prescriptions and anything that would incriminate her. . . her husband and another fellow . . . did it." The Akers both testified that Mr. Davis came to their home with his wife to deliver a garbage bag containing improperly completed CMNs and prescriptions at various stages of completion.

In addition to evaluating Mr. Davis's knowledge, motive, and conduct based on the testimony of others, the jury also had the opportunity to hear from Mr. Davis himself when he took the stand. He testified at trial, denying any knowledge of or direct involvement in the health-care fraud scheme. This provided the jury with an opportunity to view his demeanor and judge his credibility, a trial-level advantage for which an appellate court's review of a paper record can provide no comparable substitute. As indicated by the verdict, the jurors hearing this testimony unanimously agreed that Mr. Davis had knowingly aided and abetted Medicare fraud. We are loath to override their conclusion. The Supreme Court has made clear that "[t]he trier of fact, not the appellate court, holds 'the responsibility . . . fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Tibbs v. Florida*, 457 U.S. 31, 45 n.21 (1982) (citing *Jackson*, 443 U.S. at 319). Upon our review of the record, we cannot conclude that no reasonable juror would, when faced with the evidence against Mr. Davis, arrive at this result.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court.