NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0624n.06

No. 07-5644

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
**Sep 23, 2010**
LEONARD GREEN, Clerk

PAUL ALLEN WOODS,                              )
                                               )
         **Petitioner-Appellant,**             )       **ON APPEAL** FROM THE
                                               )       UNITED STATES DISTRICT
v.                                             )       COURT FOR THE MIDDLE
                                               )       DISTRICT OF TENNESSEE
                                               )
UNITED STATES OF AMERICA,                      )          **O P I N I O N**
                                               )
         **Respondent-Appellee.**              )


BEFORE:  NORRIS, MOORE, and McKEAGUE, Circuit Judges.


**ALAN E. NORRIS, Circuit Judge**.  Petitioner Paul Allen Woods appeals from the denial

of his motion to vacate his sentence filed pursuant to 28 U.S.C. § 2255.  In November 2000,

petitioner entered into a written plea agreement with the government.  He conceded guilt on two

counts of a seventeen-count superseding indictment and subsequently received a sentence of life

imprisonment.  His direct appeal was dismissed by this court because the plea agreement included

a provision waiving his right to appeal.  In this proceeding, petitioner raises three issues: ineffective

assistance of trial counsel based upon a conflict of interest; prosecutorial misconduct; and the

constitutionality of his sentence.

**I.**

In a memorandum opinion denying petitioner's ineffective assistance of counsel claim, the district court[1] gave the following summary of the underlying criminal activity that resulted in this prosecution and subsequent guilty plea:

> A lengthy federal investigation determined that between 1993 and 1999, the sophisticated Paul Woods drug organization was responsible for distributing hundreds of kilograms of cocaine in the Middle District of Tennessee. Motor vehicles equipped with hidden compartments exchanged currency and cocaine between Nashville, Texas, and Florida. The investigation revealed that Petitioner used funds acquired by his drug organization to finance the ownership of a nightclub and various businesses associated with the promotion and production of rap music. On June 25, 1997, Petitioner became a fugitive; he eluded capture after he displayed a pistol to officers, fled in a vehicle, and then fled on foot. The details of Petitioner's criminal misdeeds are numerous, including hiding money in a safe, getting his girlfriend to hide money for him, ordering others to transfer drugs and money, and hiding from the police in both Nashville and Atlanta. After discovering a warrant had been issued for his arrest, Petitioner even attempted to have plastic surgery to change his appearance in order to continue to elude capture.
>
> Petitioner has appeared before this Court on numerous occasions and this Court has found that Petitioner pervasively obstructs justice. Petitioner lied under oath to the grand jury and suborned perjury when he attempted to get two witnesses to lie at his sentencing hearing.
>
> On November 27, 2000, Petitioner attended a plea hearing at which he attempted to plead guilty to the entire indictment charged against him. However, he continually denied an essential element of one of the charges. This Court rejected his pleas and advised him that pleading guilty to the entire indictment would mandate a life sentence without possibility of parole. On November 28, 2000, Petitioner again

---

[1]The Honorable Thomas A. Wiseman, Jr., presided over the original prosecution and the early stages of the § 2255 proceedings. However, after Judge Wiseman denied the ineffective assistance of counsel claim, petitioner filed a motion requesting that the judge recuse himself. That motion was granted and the case was transferred to the Honorable William J. Haynes, Jr.

appeared for a plea hearing, again attempted to plead guilty to the entire indictment, but again denied a leadership role under the continuing criminal enterprise charge. Therefore, this Court again rejected the plea. Prior to both appearances, Petitioner had rejected the plea. On November 29, 2000, Petitioner appeared a third time and pled guilty to conspiracy to counts two and three of the indictment. Petitioner offered a plea agreement he had drafted and signed. After three modifications were made to the agreement and initialed by Petitioner, the Court accepted his guilty plea pursuant to that agreement.

Memorandum, Sept. 5, 2003 at 2-3 (footnote omitted).

The focus of the two principal claims advanced by petitioner concern the events that led to his decision to plead guilty. Judge Wiseman did not conduct an evidentiary hearing before denying petitioner's ineffective assistance of counsel claim. However, on June 12, 2006, Judge Haynes conducted a one-day hearing on the prosecutorial misconduct allegations which by necessity touched on the representation petitioner received during plea negotiations. The district court ultimately denied the claim in a memorandum and order filed April 19, 2007. Because this court reviews the factual findings of the district court in a § 2255 proceeding for clear error, *Hamblen v. United States*, 591 F.3d 471, 473 (6th Cir. 2009), it makes sense to rely upon findings of fact set forth in its April 19, 2007 memorandum:

[Robert] Marlow, Woods's defense counsel, testified that Woods initially wanted to go to trial. In October 2000, Woods expressed his interest in pursuing a plea agreement. As a condition to any plea agreement, Woods had to enter a proffer agreement. Under the proffer agreement, Woods would have to agree to be debriefed or interviewed by government officials to enable them to determine whether to accept his offer to plead guilty and also whether to agree to request a reduced sentence. Marlow testified that Woods agreed to the proffer or debriefing process. "I had been informed that Woods wished to try to reach an agreement. I contacted Mr. [Sunny] Koshy [the assigned Assistant United States Attorney] myself. Mr. Koshy and Mr. Goodman [a DEA agent] and possibly one other. We went over and had an initial meetings [sic] with Mr. Woods at Metro Center. I think basically to make sure that

[Woods] was going to cooperate and he was willing to tell what he knew about drug trafficking."

Wood's first proffer session with federal officials was at the Metropolitan Nashville Criminal Justice Center where Woods was detained. James (Benny) Goodman was the lead agent for the Drug Enforcement Administration ("DEA"). At that time, Goodman was a police officer with the Metropolitan Nashville-Davidson County police department and an agent of the DEA Drug Task Force created by the DEA's Nashville Office. At this initial meeting, Goodman observed Koshy review the proffer letter agreement with Woods in great detail. Thereafter, Woods, Marlow, Koshy and Goodman signed the proffer letter agreement.

After that initial proffer session, there were nine additional debriefings at DEA's Nashville office in the Courthouse building. As part of his agreement to cooperate with the government, Woods was interviewed at the DEA's office . . . at various times, by Sunny Koshy, the lead Assistant United States Attorney, Goodman, the lead DEA agent and William DeSantis, the lead Internal Revenue Service ("IRS") agent. DeSantis did not participate in all of the Woods's debriefings. As to the substance of Woods's cooperation in the debriefing sessions, Goodman explained that by the time of Woods's debriefing, many of Woods's co-defendants had agreed to cooperate with the government. Goodman agreed with the characterization of Woods's cooperation as "fairly inconsequential."

After several hours at one of the proffer sessions, Woods requested lunch and asked Goodman whether Tracey Buford, his girlfriend who operates a restaurant, could bring his lunch to the DEA office. Goodman agreed to allow Buford to deliver lunch to the DEA office. Woods and Marlow ate their lunch in a small DEA interview office. Buford was also in the same office. Goodman did not remain in that office the entire time and would repeatedly exit and reenter. According to Goodman, Buford brought Woods lunch to four or five of these debriefing sessions. On each of those occasions, Goodman conceded that after lunch and before Buford's departure, Woods requested to have a "couple of minutes" of private time with Buford, his girlfriend, and each time Goodman agreed. Goodman estimates that Buford and Woods were alone for two or three minutes and at most four minutes. During these visits, Woods was dressed in a jumpsuit and his legs were shackled. Goodman would reenter the room anytime unannounced.

. . . .

According to Woods and Buford, during this private time, they had sexual relations in the DEA conference room. Buford described these encounters as lasting

- 4 -

five (5) to ten (10) minutes. Woods and his girlfriend insist that the scenario was repeated during several of Woods's subsequent DEA interviews. Woods and his girlfriend also testified that Goodman was aware of this sexual activity in the DEA office and that Goodman also engaged in sexual banter with them. Woods and Buford also insist that Koshy, Goodman and DeSantis approved of these sexual encounters. Yet, Buford conceded that her testimony about Koshy's, Goodman's and DeSantis's approval of these visits is based upon what Woods told her.

Marlow, Woods's counsel, remained in the room during these private visits of Woods and Buford, but would turn his back on them. Marlow denied hearing any conduct by Woods and his girlfriend that was suggestive of sexual intercourse in that small DEA office. Goodman could not recall whether Marlow always remained in the room, but does recall one debriefing when Marlow stepped outside of the room to ask about the agents' view of the value of the Woods's debriefing and the level of his cooperation. As to Woods and Buford being alone, DeSantis also recalled only one time when agents and Marlow stepped outside to talk for a couple of minutes, probably at Marlow's request. DeSantis never received any requests from Woods for time alone with Buford nor heard any such requests by Woods to Koshy or Goodman. Except for that one occasion, whenever DeSantis was present, Marlow was in the room with Woods and Buford.

The issue of Woods's private visits and sexual contact with his girlfriend arose during Woods's criminal proceedings. In a letter filed by the Clerk's office on April 25, 2001, Woods wrote to Judge Wiseman about, among other things, the luncheon office visits with his girlfriend and free local and long distance telephone calls and complained of Koshy's and Goodman's involvement in these matters. Koshy's response was that the Court should investigate the matter and that with this letter, Woods was trying to secure a downward departure motion. Noteworthy is that the primary focus of this letter is Woods's denial of a leadership role in the conspiracies. Woods's letter ascribes to the government officials the following purpose for the visits and telephone calls: "Your Honor I the defendant Paul Woods feel that just because DEA officer Goodman provided me with sexual activities during and after debriefing sessions and unlimited free local and long distance calls to Atlanta, Ga. and also allowing me to have meals brought to me during our sessions, <u>that I would be willing to lie for the government.</u>" . . . <u>The defendant, Paul Woods, feels that the government is trying to breach the plea agreement because the defendant is not willing to lie for the government</u>." Woods testified at his May 9, 2001 sentencing hearing, but did not mention either the Buford visits nor the telephone calls cited in his April 25th letter.

To be sure, Woods presented a transcript of a telephone conference that Woods arranged with Marlow. The transcript includes a statement attributed to Marlow "that was many occasions that we up there and (inaudible) . . . would leave you two alone." In addition, John Peryam, a second year law student who assisted Woods in this action, interviewed Marlow by telephone at Woods's request. Peryam's interview was based upon a draft affidavit prepared by Woods for Marlow describing Buford's sexual visits with Woods at the DEA office. According to Peryam, Marlow stated that Woods and his girlfriend were left alone to have sexual contact. Marlow never observed sexual intercourse, but did see them groping each other. Peryam testified that he recalled Marlow saying that Sunny Koshy had knowledge of these visits. Yet, Peryam's contemporary notes of that conversation actually reflect that Marlow's statement was that he "assumed" Koshy and Goodman knew about these contact visits. In addition, Peryam's notes reflect that Marlow used the phrase "private contact," not sexual contact or relations. In a subsequent conversation with Peryam, Marlow felt uncomfortable about any such statement about Koshy. Peryam prepared a draft affidavit for Marlow, but Marlow never signed that draft.

Sonja Howard, another of Woods's girlfriends who lives in Atlanta, testified that she spoke with Woods in a telephone conversation arranged by Goodman. According to Howard, Goodman told her he wanted her to identify two pictures. Woods then talked to Howard and Woods told her that if she came to Nashville, they would get ten (10) minutes alone. Howard came to Nashville and spoke to Goodman, but she did not see Woods. According to Howard, Goodman told her that Woods had "p'd him off" and there would not be any personal visit. Goodman, however, denied any conversation with Howard about her having a private visit with Woods. Goodman conceded that Woods may have made a long distance telephone call to Howard in Atlanta from the DEA's Nashville office, but Woods never requested that Howard be brought to Nashville.

Koshy denied any knowledge or approval of any sexual contact visits between Woods and Buford. Koshy and Goodman explained that in some circumstances, DEA allows a defendant to have family visits while the defendant is in DEA custody, but neither the DEA nor Goodman authorized sexual contact between Woods and his girlfriend. Koshy and Goodman did discuss Buford's providing food to Woods as generating a *Giglio* disclosure for any testimony by Woods. Goodman denies any sexual banter with Woods or Buford.

As Woods's motivation to plead guilty, Marlow testified: "I think Woods wanted to enter a plea, I think he wanted to try to and cut a deal and minimize exposure to time that he was going to face incarceration." As noted earlier, Woods's

proffer agreement establishes that Woods's decision to plead guilty was made prior to the first of these contact visits. Woods's letter to the Court and his handwritten plea agreement establish Woods's independent decision to plead guilty.

As to these factual disputes, the Court first credits the testimony of Sunny Koshy, that he was unaware of and did not authorize or condone any of Woods's private visits or sexual contact with Buford. Goodman actually agreed to Woods's brief visits with Buford. Although Woods and his girlfriend had some sexual contact on these visits, the Court credits testimony of Marlow who was in the room at the time of most of these visits, that Woods and his girlfriend did not have sexual intercourse. According to Marlow, Woods and his girlfriend had only a few minutes in the small DEA conference room and sexual intercourse did not occur. There may have been some banter between Woods, his girlfriend and Goodman, but the Court finds that the banter of the sexual nature described by Woods and his girlfriend, did not occur.

Memorandum, April 19, 2007, at 5-10 (citations omitted) (emphasis in original).

Against this backdrop looms the question of defense counsel Marlow's representation of his client. Petitioner retained him for $28,000 and the deed to six acres of land. On October 18, 2000, Marlow filed a motion to withdraw with a supporting affidavit. According to the affidavit, he had consulted with attorneys at the Disciplinary Council of the Tennessee Board of Professional Responsibility about a potential conflict of interest and had been advised that he had an actual conflict, not simply a potential conflict.

On the day that counsel filed his motion, he appeared at the first proffer meeting with petitioner and AUSA Koshy, Goodman, and one other individual. In an affidavit sworn in 2003, petitioner states that Marlow arranged this meeting without his permission. In the same document, petitioner alleges that Marlow asked him if he knew Vaughn Askew, whom Marlow was representing in another drug prosecution. This dual representation created the potential conflict of interest.

On October 20, the district court held a hearing on the motion to withdraw. Marlow told the court that he had discovered an actual conflict of interest at about the same time that petitioner decided to explore cooperating. According to Marlow, he had been advised by disciplinary counsel that "I had a conflict . . . if either one of these clients went to trial." However, Marlow went on to explain that he could remain as counsel under certain conditions:

> [Disciplinary counsel] also opined . . . that if they both were cooperating and the cooperation was not inconsistent as to each other's culpability, then there would be no conflict . . . .
>
> I have made full disclosure to both clients, the conflict I have explained to Mr. Woods, that if he was going to persist in his plea of not guilty and go to trial, it is mandatory I would have to withdraw, I was disqualified. I also explained to him if he decided to cooperate . . . , it is my opinion that I probably could continue to represent him but he would have to waive that conflict . . . .

The court then asked petitioner, who was present, if he understood the situation. He said that he did and that he wanted to have Marlow represent him and to continue to cooperate with AUSA Koshy. Petitioner also told the court that he did not object to Marlow's continued representation of Vaughn Askew. The court then gave petitioner the following advice:

> [Y]ou don't have to waive your right to have another lawyer. You could insist upon it and if you couldn't hire somebody else, the Court would appoint somebody else for you. But you have a right to have somebody who does not have any sort of an apparent conflict of interest or potential conflict of interest. . . . On the other hand, it's something you can waive if you are satisfied with what Mr. Marlow is doing and what he has done and what he proposes to do for you . . . .

Petitioner elected to "stay" with Marlow.

Thereafter, petitioner and Marlow participated in the debriefing sessions described earlier. In his 2003 affidavit, petitioner states, "After the first few meetings with the government, Mr.

Marlow informed me the government was impressed with my information and wanted to use me as a witness in future trials. He indicated I could expect to receive a plea agreement providing for between 3-7 years in prison."

On November 22, 2000, the government sent Marlow a proposed plea agreement that contemplated a sentence of between 20 years to life in prison. Petitioner refused it "because I felt the government would provide a better offer."

A plea hearing had been set for November 27 and petitioner intended to plead not guilty. Koshy and Marlow met with him. According to petitioner, when they heard that he intended to reject the plea, they both became angry and Marlow told him that he was being stupid. At the hearing, petitioner attempted to plead guilty to the entire indictment as discussed by Judge Wiseman in the portion of his memorandum opinion quoted earlier. The court continued the hearing because it was convinced that petitioner did not fully understand what he was doing. According to his affidavit, petitioner's "intent was to take responsibility for my illegal actions to the extent I believed I was guilty of them. However, I was unwilling to take responsibility for actions I was not guilty of, specifically having a leadership role and the gun possession charge."

In any event, the next day the court began the plea colloquy but stopped when petitioner continued to deny a leadership role. The court explained its position to petitioner in these terms:

> Now, I didn't write the Indictment; the Grand Jury did. That is what the Grand Jury has charged you with. Now, when you come before me, I have two choices. You can stand up here and plead guilty to it, or you can go to trial. Now, there is a third choice that I don't have anything to do with. And that is you and your lawyer and the U.S. Attorney can work out an agreement. . . .

> . . . [A]nd furthermore, your lawyer, if you go to trial, is going to have to
> withdraw from representing you because he has a conflict with another person that
> he has represented, who would likely be a witness against you . . . .

The district court then set trial for May 7, 2001. Marlow renewed his motion to withdraw, which the court granted with the provision that he return any portion of the retainer which "is fair under what you have done."

The next day, November 29, petitioner was again brought to court. Despite having withdrawn as his attorney, Marlow was present along with AUSA Koshy and they spoke with petitioner before court proceedings began. Petitioner had prepared a handwritten plea agreement, which he gave to Koshy. It provided for a five to forty year sentence. Koshy accepted the agreement and inserted language that there were no other agreements, which petitioner initialed.

When proceedings convened, Koshy informed the district court that "apparently Mr. Woods wants to continue on with Mr. Marlow as his retained counsel." Turning to the terms of the plea agreement, the district court observed that the sentencing range was inaccurate and must be 20 years to life imprisonment. After some discussion, the agreement was amended and initialed by petitioner. During the hearing, Koshy noticed that paragraph ten of the agreement omitted language making it clear that whether petitioner should receive a U.S.S.G. § 5K1.1 reduction in sentence was a matter to be determined by the government. The district court considered the omission "a contrived ambiguity" and petitioner initialed a change to the agreement that included that language.

Addressing petitioner, the district court went through the terms of the plea agreement and determined that the plea was based upon petitioner's free will. It also conducted a final colloquy

with petitioner about Marlow's conflict of interest and elicited from petitioner that he wished to keep Marlow as his attorney despite these potential problems. The plea was ultimately accepted.

On April 2, 2001 petitioner wrote the letter to the district court alluded to earlier in which he informed the court of the sexual improprieties that occurred during the plea negotiations and also asserted that the government sought false testimony. According to his affidavit, this letter elicited a response from Marlow who visited petitioner and told him to "stick to the damn plan."

Petitioner's sentencing hearing occurred on May 9, 2001. He received a sentence of life imprisonment. No § 5K1.1 motion for substantial assistance was filed by the government.

**II.**

In reviewing the denial of the three claims for relief advanced by petitioner, we apply a *de novo* standard of review to the legal conclusions reached by the district court but must uphold its factual findings unless they are clearly erroneous. *Benitez v. United States*, 521 F.3d 625, 630 (6th Cir. 2008). To warrant relief under 28 U.S.C. § 2255, a petitioner must demonstrate the existence of "an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). With those precepts in mind, we turn to the arguments advanced by petitioner.

1. Ineffective Assistance of Trial Counsel

This court dealt with a case of an alleged conflict of interest due to multi-defendant representation some years ago in *Thomas v. Foltz*, 818 F.2d 476 (6th Cir. 1987), and that case continues to provide a roadmap to the proper analytical approach in such cases:

The starting point for analyzing a claim of ineffective assistance of counsel is the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Under that standard, a criminal defendant must show both that his counsel's performance was deficient and that it prejudiced his defense in a manner which deprived him of a fair trial. This standard is adjusted, however, when dealing with a situation where a defendant enters a guilty plea instead of being found guilty after a trial. In the context of guilty pleas, the first element, the "performance" aspect, of the *Strickland* test remains the same but the second element, the "prejudice" requirement, changes. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

The instant case involves a specific type of ineffectiveness claim, that of conflict of interest, which is also examined under a slightly different standard from that used in a traditional ineffectiveness claim. The Supreme Court set forth the standard for determining conflict of interest cases in *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and summarized it again in *Strickland* as follows:

> In *Cuyler* . . . [we] held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts . . . it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest. Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above [actual or constructive denial of the assistance of counsel altogether]. Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance."

*Strickland*, 466 U.S. at 692, 104 S.Ct. at 2067 (emphasis added) (quoting *Cuyler*, 446 U.S. at 345-50, 100 S.Ct. at 1716-19). This Circuit has interpreted the *Cuyler* test as directing courts "to determine, on the facts of each case, whether there is an actual

conflict of interest and whether that conflict has caused ineffective performance in violation of the provisions of the Sixth Amendment. . . ." *Smith v. Bordenkircher*, 671 F.2d 986, 987 (6th Cir.), *cert. denied*, 459 U.S. 848, 103 S.Ct. 107, 74 L.Ed.2d 96 (1982).

Just as the *Strickland* standard has to be adapted to the guilty plea context, so must the *Cuyler* standard be adapted. The primary question in the guilty plea context is whether the plea was a "voluntary and intelligent choice" made by the defendant. *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970). Thus, in order to successfully assert a claim of ineffective counsel based on a conflict of interest, a defendant who entered a guilty plea must establish: (1) that there was an actual conflict of interest, *Smith*, 671 F.2d at 987; and (2) that the conflict adversely affected the voluntary nature of the guilty plea entered by the defendant.

*Foltz*, 818 F.2d at 480 (citation and footnote omitted). It is worth emphasizing that the Supreme Court held in *Cuyler*, that "[i]n order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 350.

Petitioner contends that defense counsel Marlow had two conflicts of interest: he represented potentially adverse parties, albeit in separate prosecutions; and he had a financial stake in obtaining a guilty plea from his client.

In *United States v. Hall*, 200 F.3d 962 (6th Cir. 2000), we reversed the denial of a § 2255 motion to vacate based upon ineffective assistance stemming from a conflict of interest. In that case, counsel represented two brothers, one of whom was much more culpable than the other. Counsel took the case to trial rather than encourage the less culpable defendant to enter into a plea agreement, which would have resulted in significantly less prison-time than he eventually received. In reversing, we noted that "[f]oregoing plea negotiations is proof of an actual conflict of interest." *Id.* at 966 (citing *Foltz, supra*; *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978)); *see also Ruffin v. Kemp*, 767

F.2d 748, 752 (11th Cir. 1985) (attorney's negotiation of plea bargain for one client that included testimony against another client is actual conflict of interest).

In *Wheat v. United States*, 486 U.S. 153 (1988), the Supreme Court affirmed the refusal of the district court to allow a defendant to waive a potential conflict of interest in order to be represented by the same counsel as his co-defendants. The trial court had concluded that such representation would likely result in a conflict of interest. In the Supreme Court's view, "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163. Where, as in the instant case, a trial court has been informed that a conflict may arise, it "must take adequate steps to ascertain whether the conflicts warrant separate counsel." *Id.* at 160.

Turning to the facts of his case, in his affidavit supporting his initial motion to withdraw, Marlow averred that he had an actual conflict of interest due to his representation of another person (Askew). In the hearing on the motion to withdraw, AUSA Koshy conceded that "Mr. Askew did provide information that I would have used in any trial of Mr. Woods." As recounted earlier, however, the district court informed petitioner that "you have a right to have somebody who does not have any sort of an apparent conflict of interest or potential conflict of interest," and went on to explain, "it's something you can waive if you are satisfied with what Mr. Marlow is doing and what he has done and what he proposes to do for you, that is your right."

As did the district court, we conclude that Marlow labored under a potential, rather than actual, conflict of interest. Because petitioner was made abundantly aware of that potential conflict, he could, and did, waive his right to be represented by someone else. *See United States v. Davis*, 490 F.3d 541, 548 (6th Cir. 2007) ("[a] defendant may make a knowing, intelligent, and voluntary waiver of [his] right to conflict-free counsel, and a defendant has a Sixth Amendment right to counsel of [his] choice") (quoting *United States v. Straughter*, 950 F.2d 1223, 1234 (6th Cir. 1991)). This conclusion is bolstered by a number of factors. First, counsel himself recognized a conflict and filed a motion to withdraw. Second, the district court responded by fully informing petitioner of his options, including that Marlow could not proceed to trial. And, third, petitioner acknowledged those restrictions but elected to proceed with Marlow. In short, petitioner knowingly elected to enter a plea of guilty despite the court's guidance concerning the implications of Marlow's potential conflict and his option to retain new counsel. Given the facts before us, petitioner's waiver of conflict-free counsel was valid and hence his Sixth Amendment claim was properly rejected by the district court.

2. Prosecutorial Misconduct

The allegations that accompany petitioner's prosecutorial misconduct claim are admittedly troubling. Even if we accept the factual finding of the district court that, while "Woods and his girlfriend had some sexual contact on these visits, [they] did not have sexual intercourse," Agent Goodman exhibited poor judgment by according petitioner personal favors while plea negotiations were ongoing. However, poor judgment does not necessarily amount to prosecutorial misconduct sufficient to entitle petitioner to § 2255 relief.

In assessing whether a plea was knowing and voluntary, courts must consider whether the plea was induced by improper threats, promises, or other things that have "no proper relationship to the prosecutor's business." *See Brady v. United States*, 397 U.S. 742, 755 (1970) (citation omitted). Petitioner argues that Agent Goodman's acquiescence to intimate contact between petitioner and Ms. Buford rose to the level of a bribe, rendering his guilty plea less than free and voluntary.

While the contact between petitioner and Ms. Buford was ill-advised, there is nothing in the record to indicate that it affected petitioner's ultimate decision to plead guilty. In reaching this conclusion, we affirm based upon the reasoning of the district court:

> The Court first concludes that these visits did not impact Wood's decision to plead guilty. The Court credits Woods' statements in his plea colloquy that no one had applied any psychological or other pressure to get him to waive his rights and to plead guilty. As Woods' counsel testified Woods wanted to plead guilty given his substantial criminal activities and his extensive exposure at sentencing. Second, the proffer sessions that later led to these contact visits, did not begin until Woods had decided to plead guilty. Third, in his letter to Judge Wiseman before his sentencing, Woods does not suggest that these visits caused him to plead guilty, rather Woods asserted that the Government was breaching a plea agreement. Woods rejected the government's plea offers and insisted upon and wrote his own plea agreement. The government accept[ed] Woods' handwritten plea agreement that was the basis for his convictions. Thus, the Court finds the lack of a causal connection between Woods' decision to plead guilty and these visits with Buford.
>
> The Court also concludes that these visits were not intended to provide any sexual contacts so as to elicit any plea agreement or facilitate any cooperation from Woods. Woods had agreed to cooperate before any visit from Buford. At the time of Woods' debriefing and cooperation, most of his co-defendants were already cooperating with the government, as reflected by their testimony at Woods' sentencing hearing.

Memorandum, April 19, 2007, at 11.

Petitioner also invokes a legal proposition explicitly rejected by the Seventh Circuit: that "outrageous" governmental conduct may rise to a level where it so shocks the conscience that it becomes an independent ground for ordering a new trial. *See United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995). The Seventh Circuit's resolution of this claim is not binding on us, however, and the Supreme Court and this court have previously considered whether conduct by the government that is so outrageous that it "shocks the conscience" could bar prosecution. *See Hampton v. United States*, 425 U.S. 484, 489-90 (1976); *United States v. Payne*, 962 F.2d 1228, 1231-32 (6th Cir. 1992). Each case involved the allegedly outrageous acts of governmental agents investigating criminal activity: in *Hampton*, by controlled drug purchases; in *Payne* by setting up a sting operation to undercover money laundering. In *Hampton*, the Supreme Court acknowledged that language from a prior opinion, *United States v. Russell*, 411 U.S. 423 (1973), implied that such a set of facts might arise: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Hampton*, 425 U.S. at 489 (quoting *Russell*, 411 U.S. at 431-32). The Court went on to distinguish that language before concluding, "[t]he limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the Defendant." *Id.* at 490. *Payne* echos that language. 962 F.2d at 1231 (citing *Hampton*). In neither case did the court grant defendant the requested relief.

Even if we acknowledge that under some circumstances the government's conduct in prosecuting a criminal case may be so outrageous that a defendant's due process rights are

implicated, the facts before us are not remotely close to making out such a claim. No protected right of defendant was violated and we therefore hold that this theory does not entitle petitioner to relief.

3. Sentencing

Petitioner's final claim is that the district court failed to take the sentencing factors outlined in 18 U.S.C. § 3553(a) sufficiently into account, including petitioner's difficult childhood. Instead, the court relied on the sentencing guidelines when it imposed a mandatory life sentence. Petitioner argues that he should have been sentenced under *United States v. Booker*, 543 U.S. 220, 249 (2005), which changed the sentencing landscape by instructing district courts to use the guidelines as advisory only. However, the district court imposed petitioner's sentence before *Booker* and its progeny were decided and this court has held that the post-*Booker* sentencing regime is not to be applied retroactively. *Humphress v. United States*, 398 F.3d 855, 863 (6th Cir. 2005). Consequently, petitioner's challenge to the calculation of his sentence must be rejected.

**III.**

The judgment of the district court is **affirmed**.