NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0474n.06

No. 18-3497

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Sep 11, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| VICTORIA HAWKINS, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:    BOGGS, BATCHELDER, and STRANCH, Circuit Judges.

**BOGGS, Circuit Judge.** Victoria Hawkins was a client and then an employee of a company called BRIDGES. BRIDGES had a series of contracts to give job training to welfare recipients. The company's general manager, Daniel Morris, overbilled for its services, thereby defrauding the federal government of more than $3.5 million. Morris gave almost $1.3 million of the proceeds to Hawkins, in the form of two houses, three cars, and about $750,000 in cash. A jury convicted Hawkins of conspiracy, federal-program fraud, and money laundering. She now challenges the sufficiency of the evidence and a jury instruction. We are unpersuaded by these arguments, so we affirm her conviction.

## I. Background

BRIDGES opened for business in Toledo, Ohio in 2001. Daniel Morris was the company's general manager, and his job "was to run everything." From 2004 to 2015, BRIDGES had 17 contracts with the Lucas County, Ohio Department of Job and Family Services, worth more than

$15.7 million. These contracts related to Temporary Assistance to Needy Families, a cash assistance program for certain low-income households. The federal Department of Health and Human Services funds TANF by giving block grants to the states. In Ohio, the state passes the money to county agencies, which administer the program. Lucas County hired BRIDGES to help TANF recipients train for and find jobs. To this end, BRIDGES and the county entered into a series of "cost reimbursement contracts." BRIDGES provided its services, incurred the resulting costs, and periodically requested reimbursement from the county.

This is where the fraud happened. BRIDGES did the work. But Morris inflated his reimbursement requests and falsified supporting documents. He invented "ghost employees," overstating the company's payroll expenses. He also exaggerated his real employees' transportation expenses. To survive annual audits by the county, he had his accountant keep "a separate set of books." Morris and the accountant also forged bank records, audit reports, board-meeting minutes, time sheets, and mileage reports. The IRS discovered the overbilling scheme while investigating unrelated tax fraud by Morris, and BRIDGES went out of business. Ohio's State Auditor later reviewed BRIDGES bank records and discovered $3,552,740 in impermissible expenditures and non-payroll checks. (The audit only went as far back as 2011, so the actual loss was presumably higher.)

$1,289,566.50 of this money went to Victoria Hawkins. Hawkins started out as a BRIDGES client. Later, Morris hired her to help other clients write résumés. She worked at BRIDGES from September 2008 to sometime in 2011 or 2012. After she left the company, she maintained a close relationship with Morris, who confessed that he was in love with her and offered to "take care of [her]."

He did exactly that. Morris bought Hawkins two houses, one for $47,000 and the other for $400,000. He also bought her three cars, for $27,969.80, $44,916.20, and $19,680.50. He also gave her a debit card and deposited about $750,000 in the associated checking account, which was in the name of BRIDGES. She used the money to pay bills and buy clothes, purses, limo rides, and vacations. Morris paid for all of this out of BRIDGES bank accounts—and Hawkins knew this.

Hawkins went to trial (along with co-defendants James Moody and Angela Bowser, fellow recipients of Morris's largesse whose appeals we address in separate opinions), and the jury convicted her on all counts:

| Count(s) | Offense | Statute |
|----------|---------|---------|
| 1 | Conspiracy to commit program fraud and mail fraud | 18 U.S.C. § 371 |
| 3–4 | Program fraud | 18 U.S.C. § 666(a)(1)(A) |
| 13 | Money-laundering conspiracy | 18 U.S.C. § 1956(h) |
| 14, 16–18 | Money laundering | 18 U.S.C. § 1957 |

The district court sentenced her to 54 months in prison, and she timely appealed.

## II. Sufficiency of the Evidence

Each of the charges had a knowledge element: The government needed to prove not just that Hawkins accepted money that Morris had fraudulently obtained, but also that she knew the money was ill-gotten. *See* R. 161, 2359, 2363–64, 2368, 2374, 2376 (so instructing the jury). She argues that the evidence of her knowledge is insufficient. We disagree.

In sufficiency-of-the-evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). It is the jury's job, not ours, "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Ibid.*

As Hawkins points out, the government introduced no *direct* evidence that she knew about the overbilling scheme. Morris and his bookkeeper never implicated her in the submission of inflated reimbursement requests and forged records. And she testified that she knew nothing about the fraud (or any other aspect of the BRIDGES finances).

But, "[a]s we have noted in the past, it can be difficult to obtain direct evidence of something so internal as intent to commit fraud." *United States v. Washington*, 715 F.3d 975, 980 (6th Cir. 2013). Jurors are therefore free to "consider circumstantial evidence and draw reasonable inferences from" it. *Ibid.* The circumstantial evidence here is sufficient to sustain Hawkins's conviction.

First, Hawkins received large sums of money—almost $1.3 million—unrelated to her work for BRIDGES. Hawkins admitted that she knew this money came from BRIDGES, not Morris personally. Morris bought her a $400,000 house, and she delivered BRIDGES checks to the seller to pay for it. He also gave her access to a BRIDGES account at Charter One bank; he deposited an average of $27,000 to $32,000 in company funds into this account each month so "she could pull money out any time she needed to get to it." This happened "after [she] quit working for BRIDGES"; none of the money she took was connected to any legitimate, reimbursable business expense. This alone is strong circumstantial evidence that Hawkins knew about the fraud. *See, e.g.*, *United States v. Dodson*, 817 F.3d 607, 610 (8th Cir. 2016) (finding sufficient evidence of knowledge where the defendant was not directly involved in the overbilling scheme, in part because he "cashed checks for work he knew he did not do . . . from an organization he had never worked for"); *United States v. Weaver*, 220 F. App'x 88, 91–92 (3d Cir. 2007) (holding, in a wire-fraud case, that defendant's receipt of paychecks for a no-show job was sufficient evidence of specific intent to defraud).

Second, Hawkins lied to IRS investigators and a grand jury about her role in BRIDGES and the cars Morris bought her. IRS Special Agent Dean Martin interviewed Hawkins in February 2015. During the interview, she claimed that she was still working for BRIDGES as an independent contractor. In fact, she had left the company years earlier and had never been an independent contractor. She made more false statements a month later, when she testified before a grand jury. She claimed to be "a community outreach manager" for BRIDGES and said she had held the job for "a little over two years." She described her "current responsibilities" in the present tense. In reality, she had not worked for BRIDGES for three years, and she never held that position when she did work there. She said she received 1099s for this work; there were none. She also testified that Morris bought her one car rather than three. At trial, Hawkins admitted that she had lied to the grand jury, claiming she did so at Morris's instruction. A reasonable juror could have inferred from these false statements that Hawkins knew about the fraud and "sought to conceal [her] own wrongful acts." *United States v. Davis*, 490 F.3d 541, 550 (6th Cir. 2007). *See also Dodson*, 817 F.3d at 610 (finding sufficient evidence of knowledge where the defendant received paychecks for a no-show job and then "lied to an investigator about doing the work—going into detail about the work he supposedly did").

Third, the jury did not have to credit Hawkins's trial testimony denying that she knew about the fraud. The jury had "an opportunity to view [her] demeanor and judge [her] credibility," and on appeal, "[w]e are loath to override their conclusion." *Davis*, 490 F.3d at 550.

For these reasons, a reasonable juror could have found that Hawkins knew she was receiving stolen money. She does not challenge the sufficiency of the evidence on the other elements of the charged offenses. Thus, the evidence is sufficient to sustain her conviction on all counts.

III.  Good-Faith Instruction

Hawkins also challenges the district court's good-faith jury instruction. She concedes that the instruction correctly stated the law, but she argues that it nevertheless was confusing or prejudicial as applied to her. This argument is meritless.

"When jury instructions are claimed to be erroneous, we review the instructions as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision. A judgment may be reversed based upon an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Williams*, 612 F.3d 500, 506 (6th Cir. 2010) (cleaned up).

Over Hawkins's objection, the district court instructed the jury that "[t]he good faith of a defendant is a complete defense to the charges of conspiracy to commit federal program theft or mail fraud . . . and federal program theft." The court went on to give an instruction that was a copy, almost verbatim, of the Sixth Circuit's pattern good-faith instruction. *Compare* Sixth Circuit Pattern Criminal Jury Instruction 10.04 (2019) *with* R. 161 at 2355–56.

Hawkins objects to one sentence of the district court's instruction: "A defendant [does not] act in good faith if, even though he or she honestly holds a certain opinion or belief, defendant also knowingly makes false or fraudulent pretenses, representations or promises to others." She concedes that this is an accurate statement of the law. But she objects that the instruction "render[ed] her ineligible" for the good-faith defense, since she lied to the IRS and the grand jury. Thus, she claims, the instruction was confusing or prejudicial.

The core problem with this argument is that the supposed prejudice comes from an inference the jury was allowed to make. As we explained above, the jury was free to take

Hawkins's lies as circumstantial evidence that she knew about the fraud and "sought to conceal [her] own wrongful acts." *Davis*, 490 F.3d at 550. Hawkins gives no other reason to think the instruction was confusing or prejudicial, and she cites no law in support of her argument. Thus, the district court did not abuse its discretion by denying Hawkins's objection to the good-faith instruction.

IV.  Conclusion

For these reasons, we **AFFIRM** Hawkins's conviction.