RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                *Plaintiff-Appellee,*

    *v.*

No. 09-6525

TIMOTHY H. PARKES,

                *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee of Chattanooga.
No. 09-00038-001—Curtis L. Collier, Chief District Judge.

Argued: January 11, 2012

Decided and Filed: February 2, 2012

Before: KETHLEDGE and STRANCH, Circuit Judges; GWIN, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** David M. Garvin, Miami, Florida, for Appellant. Debra A. Breneman, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** David M. Garvin, Miami, Florida, Wade V. Davies, RITCHIE, DILLARD & DAVIES, PC, Knoxville, Tennessee, for Appellant. Debra A. Breneman, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, Gary S. Humble, ASSISTANT UNITED STATES ATTORNEY, Chattanooga, Tennessee, for Appellee.

_____

**OPINION**

_____

    GWIN, District Judge. A jury convicted businessman Timothy Parkes on ten counts of bank fraud involving the creation of ten fraudulent entries on the books of a

_____

[*]The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

small bank in Benton, Tennessee. At trial, the government offered the theory that Parkes and the bank's President jointly created the phony entries in an effort to disguise some of the bank's earlier, troubled loans to Parkes's business.

Parkes now appeals his conviction, challenging, among other things, the sufficiency of the government's evidence; the exclusion of evidence that the bank's President had, unassisted, previously engaged in a large number of identical frauds; and the prosecutor's suggestion to the jury that an acquittal would deliver a financial windfall to Parkes. Because the government offered no direct evidence and insufficient circumstantial evidence to show that Parkes knew about or participated in the bank President's fraud—a fraud that the bank President had independent reasons for creating—we conclude that the evidence was insufficient to prove Parkes's guilt beyond a reasonable doubt, and reverse.

## I.

With this criminal case, the United States says that Defendant Timothy Parkes defrauded a federally insured financial institution by participating in a scheme to have the bank's President change the names of borrowers on the bank's records to avoid FDIC limits on the amount that could be lent to any one customer. The United States says that Parkes participated in this scheme but did not offer evidence that Parkes knew of the lending limitations. The United States says that Parkes participated in this scheme even though the bank's Board of Directors had years before approved loans to Parkes's business in excess of the FDIC limits. And the United States says that Parkes participated in this scheme in December 2002 even though Parkes and his business were not seeking any changed borrowing authority at that time and even though Parkes had guaranteed his business's payments to the bank.

\* \* \*

Timothy Parkes and his codefendant Mark Mourier founded Remington Industries, Inc. (Remington Industries or Remington), a manufacturer and distributor of automobile floor mats. Mourier was Remington's chief financial officer and supervised

Remington's office while Parkes took more responsibility for outside sales. In 1986, the two men moved Remington from Canada to Tennessee, where they became acquainted with Jim Goddard. Goddard was the President of Benton Bank (the Bank), and helped Parkes and Mourier arrange financing for Remington's operations. Remington became one of the biggest businesses in Benton, Tennessee, at one point employing more than 200 people.

Benton Bank and Remington Industries had a long relationship. Remington first borrowed money from the Bank for the construction and later expansion of an assembly plant in Benton. And with the Bank's help, Remington operated successfully. In 1999, however, Remington began a completely new manufacturing process, with disastrous results. The new process used unfamiliar chemicals, required an expensive new manufacturing line, and resulted in floor mats that could melt in the summer heat. The manufacturing choice nearly ruined Remington.

Although Remington had been profitable before its decision to switch manufacturing processes, the company lost more than $1,500,000 each year from 2000 through 2002. In 2002, and after recognizing that the new manufacturing process had become a "black hole," Remington shut down its production line and outsourced its manufacturing, mostly to Chinese manufacturers. The company quickly returned to profitability, earning nearly $380,000 in profit during the five-month period starting September 1, 2002, and more than $1,600,000 during fiscal year 2004.

By August 2001, however, Remington Industries had approximately $2,500,000 in debt to Benton Bank. In addition, Remington was overdrafting its checking account hundreds of times each month. Rather than refuse payment on Remington's bad checks, Benton Bank had been paying them and then treating the overdrafts as additional loans. At some times, Remington owed Benton Bank as much as $4,000,000.

During this time, Benton Bank was a small bank with less than $10,000,000 in capital. FDIC and internal Benton Bank regulations limited the amount the Bank could

lend to any individual customer.[1]  Remington's debts to the Bank exceeded, and had exceeded, these limits.  Because Remington's loans were too large given Benton Bank's capital, Bank President Goddard asked Remington to obtain credit from other lenders.  To that end, Remington sought another source of credit from Livingston Company (Livingston), a private-equity investment firm.  Benton Bank President Goddard, Parkes, and Mourier intended the Livingston credit to reduce Benton Bank's loans to Remington.  Livingston agreed to loan $2,250,000 to Remington Industries to pay down Remington's loans at Benton Bank if Benton Bank would give Livingston irrevocable letters of credit.  In effect, Benton Bank would receive the broad majority of the Livingston $2,250,000 investment but Benton Bank would guarantee Remington's repayment of the Livingston loans.  Benton Bank agreed to provide this guarantee to Livingston.

Remington used nearly all of the money it borrowed from Livingston to pay down its debts at Benton Bank.  But in October 2002, Remington Industries defaulted on the Livingston loans.  In turn, Livingston demanded that Benton Bank honor its letter of credit.  The Bank then paid Livingston $2,250,000, the balance Remington owed on the loans from Livingston.

After this payment to Livingston, Remington owners Parkes and Mourier each signed personal, unsecured forty-five-day notes for $1,125,000 to Benton Bank.  Nevertheless, when those notes came due in December 2002, Parkes and Mourier could not pay.  In addition to the $1,125,000 notes, Parkes and Mourier had earlier guaranteed Remington's loans from Benton Bank.

Shortly thereafter, from mid- to late-December 2002, Goddard recorded false entries in the Bank's books showing that loans totaling the same $2,250,000 had been made to ten new entities.  Although Goddard changed the Bank's records to show that the loans were made to borrowers other than Remington, Goddard never cancelled the Remington, Parkes, or Mourier notes and each remained obligated to pay Benton Bank.

---

[1]Benton Bank was prohibited from lending more than 25% of its capital to any one borrower, including related entities.

Goddard had played games with the Benton Bank books before. At a time when he was also embezzling from Benton Bank, Goddard had changed the notes of other, unrelated borrowers: At trial, Parkes tried—but was denied the opportunity—to offer evidence that Goddard had falsely documented more than three hundred loans to other borrowers and had done so without the borrowers' knowledge or participation.

Generally, Goddard's schemes worked like this: When a large loan (*e.g.*, Remington's) looked like it was going bad, Goddard would repackage the large loan into a number of smaller loans, usually in the name of fictitious entities with fake taxpayer-identification numbers. Goddard assigned these loans to thirteen addresses that he stocked for this purpose, many of which were Post Office boxes. By hiding large loan defaults, Goddard tried to avoid careful scrutiny of the Bank's records, scrutiny that would have revealed Goddard's violation of the Bank's capital-lending limits. Likely more important for Goddard, FDIC review would threaten disclosure of his embezzlement of more than a million dollars of the Bank's money.

Bank President Goddard used this scheme to hide Remington's loans, more specifically, to hide the $2,250,000 Benton Bank paid Livingston on Remington's behalf. Most likely, Goddard hoped to hide the Bank's violation of FDIC lending limitations. Benton Bank's Board of Directors already knew that the Bank had outsized exposure to Remington.[2] Less than two weeks after Parkes and Mourier failed to pay

---

[2]The government called Joe Waters, the Benton Bank Vice President responsible for communicating with the Board of Directors. He testified that the Board knew of, and approved, loans to Remington that exceeded the bank's lending authority under FDIC rules:

Q     So on December 27th, 2001, Benton Bank closed, which means provided, a
        line of credit for $1,725,000 to Remington, right?

A     Uh-huh. (Moving head up and down.)

Q     . . . [W]hen you added them up on how much was outstanding, you came up
        with that 5 million-dollar number. You remember that?

A     Uh-huh. (Moving head up and down.)

                                          * * *

Q     And now we know that the board of directors knew all about it, right?

A     Yes, sir.

their $1,125,000 personal notes, Goddard changed the Bank's books to show ten new Benton Bank loans in the names of ten as-yet-nonexistent entities. The Bank's books reflect that each entity received one loan for an amount between $200,000 and $250,000, and that the total value of the ten loans was $2,250,000, exactly the sum Parkes and Mourier owed on their personal notes.

Eventually Goddard's years of wrongdoing unraveled and he left the Bank. Thereafter, other Bank employees found a fax in Goddard's office from someone at Remington to Goddard, sent December 16, 2002. The fax was a printed copy of an email from Parkes to Remington's outside attorney, requesting the creation of ten "c corp[s]." The original email shows that Mourier—Remington's chief financial officer—was carbon copied. That email, dated December 13, 2002, read:

> Kent these are the ten names we want to use. The sense of urgency in getting this done is very high. We will see you Monday
>
>> CDN Sales
>> White Oak Investments
>> Motorworks Corporation
>> Canmark
>> Davis corporation
>> AMS Inc.
>> Polar Inc.
>> Automotive Coordinates
>> OEM Specialties Inc
>> T&T Inc

In December 2002, Benton Bank President Goddard fraudulently designated these entities as Benton Bank borrowers.[3]

---

* * *

> Q    So if it went over the 25 percent [FDIC] limit, it went over with the board of directors' knowing about it. Isn't that true?
>
> A    I think that's a fair statement.

[3]Defendant Parkes offered evidence from Kent Moore, Remington's attorney, that Benton Bank knew about Remington's plans to create limited-liability companies to import Chinese-manufactured automobile products.

Bank President Goddard pleaded guilty to two counts of misapplication of bank funds, in violation of 18 U.S.C. § 656. Parkes and Mourier were indicted for, among other things, ten counts of bank fraud, in violation of 18 U.S.C. § 1344, one for each of the December 2002 notes Goddard had documented as loans to the Remington "c corp[s]."

At Parkes and Mourier's trial, the parties contested whether Parkes and Mourier knowingly intended to participate in Goddard's scheme to repackage Remington's loans, or were merely innocent bystanders. The government's evidence on this point was both circumstantial and limited. Obviously, Goddard was best positioned to give evidence to suggest Parkes knew that Goddard would falsify the bank records. But, although Goddard's earlier plea agreement required him to cooperate with government investigators and "to testify completely and truthfully before a federal grand jury, at any trial, or [at] any other time or proceeding if called upon by the United States to do so," the government never called him as a witness. Instead, the government argued that Goddard's possession of the copy of Parkes's email to his attorney was sufficient to support both an inference that Parkes had faxed the email to Goddard and the further inference that he faxed the email with an intent to have Goddard fraudulently change the Bank's records.

In the end, the jury convicted Parkes on ten counts of bank fraud.[4] The jury acquitted Mourier.

Parkes now raises a number of challenges to his convictions and sentence. First among them: that the evidence was insufficient to support the convictions. We agree.

## II.

"Where the sufficiency of the evidence is properly before us, we consider that issue first because it is determinative of whether the appellant may be retried." *United States v. Aarons*, 718 F.2d 188, 189 n.1 (6th Cir. 1983).

---

[4]Parkes was acquitted on three other counts of bank fraud and one count of making a false statement.

Title 18, United States Code, Section 1344, punishes

[w]hoever knowingly executes, or attempts to execute, a scheme or artifice—

> (1) to defraud a financial institution; or

> (2) to obtain any moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises . . . .

"Three elements are required for a conviction for bank fraud under 18 U.S.C. § 1344: (1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC." *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001).

Parkes agrees that the government sufficiently proved that the ten December 2002 notes were part of a scheme to defraud Benton Bank. But, Parkes says, "[t]here was no evidence that [*he*] *knowingly* executed a scheme to defraud, or *intended* to defraud, Benton Bank in December 2002" or even participated in the creation of the fraudulent bank entries. Appellant's Br. at 21 (emphases added). Rather, Parkes explains, the evidence proved only that Bank President Goddard intended a fraud.

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original). Accordingly, "[a] conviction under § 1344 should be reversed only, if viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *Everett*, 270 F.3d at 989.

Even viewing the record in the light most favorable to the government, there was insufficient evidence to connect Parkes to Goddard's fraud, much less to prove beyond

a reasonable doubt that Parkes intended that fraud. Surprisingly, the government offered no testimony from Goddard to establish that Parkes cooperated in, or even knew of, the scheme, even though Goddard had already pleaded guilty with an agreement requiring him to testify "completely and truthfully . . . if called upon by the United States to do so." While that failure does not directly impact the sufficiency of the evidence, it does leave the evidentiary cupboard nearly bare.

The only item of evidence connecting anyone at Remington to the fraudulent December 2002 notes is the fax of company names Goddard received shortly before he created those notes. As the government sees it, the jury—relying exclusively on the fax and the circumstances in which it was sent—could infer both that Parkes sent the fax to Goddard and that, because he sent the fax, he did so with the knowledge and intent that Goddard would use it to create fraudulent notes. While we acknowledge that cases can properly be proved with circumstantial evidence, no rational trier of fact could travel this pathway of inferences without succumbing to reasonable doubt.

First, even assuming that the fax alone would be enough to implicate *someone* at Remington in Goddard's wrongdoing, the government made no effort to prove that *Parkes* sent the fax. At least three people—Parkes, Mourier, and Moore—had a copy of the faxed email. And there was no evidence that of those three Parkes alone had access to the fax machine at the time the fax was sent. All the jury knew for sure is that someone with access both to that email and to Remington's fax machine sent the fax. While not absurd, nothing directly supported the inference that Parkes sent the fax. Nothing excluded Mourier—Remington's chief financial officer—from having sent the fax. Mark Mourier took more responsibility for Remington's financial operations.[5] And while no evidence specifically showed that attorney Moore had access to the fax

---

[5]The United States called Joe Waters, a Benton Bank vice-president, who testified that Mourier was principally responsible for financial matters:

> Q     Did one have more financial type responsibility than the other?
>
> A     Mark had more -- he kind of done more of the reporting, it seemed, and Tim done more of the sales and the things like that, yeah.

machine, evidence did show that he had access to the email and had frequent contact with Benton Bank.

Furthermore, proving that Parkes sent the fax isn't enough. The government must also prove that Parkes sent the fax knowing and intending that Goddard would use those company names to defraud Benton Bank. Sometimes, it is true, "intent to defraud can be proven by circumstantial evidence and by inferences drawn from the scheme itself." *United States v. Isaiah*, 434 F.3d 513, 519-20 (6th Cir. 2006). But here, the government offered no direct proof of Parkes's involvement in Goddard's scheme. The fax, as sent, is not incriminating. It is a copy of an email Parkes sent to Remington's attorney reflecting that Parkes and Mourier had generated ten new company names and that they wanted the attorney to form companies using those names. The email says nothing about the purpose of those companies and it certainly does not suggest that those companies have any illicit purpose.[6]

Nor did the government offer circumstantial evidence sufficient to prove Parkes's intentional involvement in Goddard's scheme. Although "[t]he government may meet its burden through circumstantial evidence alone, and such evidence need not exclude every possible hypothesis except that of guilt," *United States v. Jackson*, 55 F.3d 1219, 1225 (6th Cir. 1995), the government still must carry its burden of proof beyond a reasonable doubt. *See also Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943) ("[C]harges of conspiracy are not to be made out by piling inference upon inference . . . .").

The government's theory was that the fraud was a joint effort by Parkes and Goddard to circumvent Bank and FDIC lending limits. But those limits did not apply to borrowers; they were limits on the Bank and, by extension, its officers. If Benton Bank had lent Remington too much money, that was a problem for Goddard and the Bank, not for Parkes. Remington and Parkes were still obligated to repay their debts.

---

[6]At trial, Parkes offered evidence that these limited-liability companies were formed to help Remington's effort—an effort Parkes argued was successful—to act as an importer of Chinese automotive product lines and to avoid difficulties that Remington otherwise would have had importing products from multiple Chinese manufacturers who, themselves, competed.

What's more, there was no evidence that Parkes even knew about the lending restrictions; indeed, the Bank's Board of Directors had previously approved loans to Remington far in excess of the limits.[7] Nor did any new money leave the Bank as a result of the December 2002 notes; Parkes and Remington were not seeking new loans. At the end of the day, the government has not identified how Parkes benefitted from the scheme.

Which ordinarily wouldn't be a problem; motive is not an element of bank fraud. But where the government seeks to prove a case solely on the basis of inferences from the circumstances, those circumstances must, at very minimum, suggest guilt. Here they do not.

We conclude that any rational trier of fact would have a reasonable doubt about Parkes's guilt. Accordingly, the district court erred when it denied Parkes's motion for a judgment of acquittal. For this reason, we reverse the judgment of the district court and remand with directions to enter a judgment of acquittal.

### III.

We might have stopped here, but some discussion of two other errors Parkes identifies may help illuminate why—in spite of fatal weaknesses in the government's case against Parkes—the jury saw fit to return a partial guilty verdict. First, the district court improperly excluded evidence that Benton Bank President Jim Goddard had both an independent motive and an opportunity to perpetrate the fraud without others' knowledge. Without that evidence, the jury had no answer to a nagging question that, we think, probably generated skepticism of Parkes's innocence: Why would Goddard have repackaged Remington's loans unless Parkes was involved?

---

[7]The government points us to a November 2005 email from Goddard to Parkes warning that Benton Bank "will be scheduled for an exam sometime soon after the 1st of the year. Thus my concern for the Rremington [sic] . . . loans." In the government's view, this email proves that Parkes knew about the lending restrictions in December 2002. Although the email may be probative of Parkes's knowledge in 2005, it is hardly "substantial and competent evidence" of his knowledge and intent three years earlier. *See Everett*, 270 F.3d at 989.

Second, the prosecutor ended his rebuttal argument with a wholly inappropriate statement to the jury, warning that an acquittal would "let [Parkes and Mourier] keep the $4 million." The prosecutor made this statement even though he knew—and had earlier moved the district court to prevent the admission of evidence establishing—that Parkes and Mourier had already paid off most of the money that Remington had borrowed from Benton Bank. The district court sustained Parkes's objection, but inadequately cured the prosecutor's improper statement. We think it likely that both errors impacted the jury's determination in this case.

A.

At trial, Parkes unsuccessfully tried to offer the testimony of Carl Stephens, another local businessman who had borrowed money from Benton Bank. Stephens would have testified that in 2001 Benton Bank loaned his company $750,000. "The loan was performing for a period of time," but in late 2001 Stephens's company "got behind in the payment of the loan[]." After Goddard left the Bank, Stephens learned that "without any notice to Mr. Stephens, Mr. Goddard and the bank had prepared false notes and placed them in the records of Benton Banking Company so that it looked like there were legitimate notes, but at no time did Mr. Stephens ever authorize the use of his name, his company's name, his address, or did he have any knowledge of" the fraudulent notes or entries in Benton Bank's records. Furthermore, Stephens said, "[a]t no time did Mr. Goddard ever tell him that Mr. Goddard was replacing the note with fake notes in a different company's name or in his name."

Parkes also sought to introduce an FDIC document that listed more than three hundred other suspicious loans on the Bank's books. According to that list, each of the loans was made to a person or entity at one of thirteen addresses, mostly Post Office boxes. Goddard used some of these same addresses for the fraudulent December 2002 loan documentation involving Remington. Parkes said he would offer evidence that Bank President Goddard falsified these three hundred loans without customer approval.

Parkes argued that both pieces of evidence were relevant to show not only that Goddard was capable of perpetrating the fraud without Parkes's help—"that a bank

president could just dummy up a loan on his own and put it on the books all by himself"—but also that Goddard had a personal motive for doing so: He "was hiding a multitude of sins that did not relate to Tim Parkes, . . . covering his tracks . . . ." Had Remington's loans gone bad, Parkes suggested, Goddard's other loans would have been more carefully scrutinized, risking exposure of Goddard's many years of fraud and embezzlement.

After hearing lengthy argument from the parties, the district court excluded both Stephens's testimony and the FDIC document. It explained:

> Based upon the arguments of counsel, the Court concludes that [propensity evidence] is what we have here—that this evidence is being offered to show that Mr. Goddard, who at least thus far has not been a witness in the case, acted in conformity with evidence of other crimes, wrongs, and acts that he may have committed. [Federal Rule of Evidence 404(b)] provides that such evidence is not admissible.

> The Court has heard discussion about motive and perhaps opportunity. After looking at the cases and hearing from counsel, the Court has concluded that this evidence does not fall within one of these purposes. And the burden is upon the Court to determine that a permissible purpose is available to take it outside the general preclusion of Rule 404(b) concerning propensity evidence. Therefore the Court will grant the government's objection.

"Although our court has a longstanding intra-circuit conflict regarding the appropriate standard of review for evidentiary decisions under Rule 404(b)," *United States v. Clay*, No. 09-5568, 2012 WL 43592, at \*13 (6th Cir. Jan. 10, 2012) (Kethledge, J., dissenting), that conflict has no effect on this case. Whether reviewed de novo in part or solely for abuse of discretion, the district court's decision to exclude Parkes's offered evidence was error. *See Schenck v. City of Hudson*, 114 F.3d 590, 593 (6th Cir. 1997) ("A district court abuses its discretion when it applies the incorrect legal standard[ or] misapplies the correct legal standard.").

First, a word on Rule 404(b). Although evidence cannot be offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," Fed. R. Evid. 404(b)(1), it certainly can be offered "for

another purpose, such as proving motive, [or] opportunity," Fed. R. Evid. 404(b)(2). "Whether Rule 404(b) prohibits the admission of a particular piece of evidence depends, therefore, on the purpose for which it is offered." *United States v. Maxwell*, 643 F.3d 1096, 1100 (8th Cir. 2011).

The *purpose* of an item of evidence cannot be determined solely by reference to its *content*. That's because "[r]elevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." Advisory Committee's 1972 Note to Rule 401. And frequently evidence will be logically relevant in more than one way. Indeed, Rule 105 contemplates this exact situation. Fed. R. Evid. 105 ("If the court admits evidence that is admissible . . . for a purpose—but not . . . for another purpose—the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly.").

Parkes demonstrated a proper purpose for his evidence that Goddard previously had fraudulently changed Bank loan documentation without customer approval: To show that Goddard had both his own means and his own motive to carry out the scheme to create the smaller, fake Remington loans on Benton Bank's books. Specifically, if Goddard did not change the loans, the FDIC would undertake a more intense review that would expose Goddard's embezzlement. If by December 2002 the Remington loans had not already exceeded the Bank's capital-lending limits, they soon would, and Goddard couldn't survive a rigorous examination of the Bank's books—he had been falsifying them (and embezzling the Bank's money) for years. So Goddard had strong individual and independent reasons to disguise Remington's troubled loan history, and to do it in secret. Moreover, Goddard's prior frauds were convincing evidence that his scheme didn't require the cooperation of the borrowers; Goddard, as Bank President, could write the notes himself and forge whatever signatures he needed.

Parkes offered the theory that Goddard alone intended a fraud, but "the question [for the jury] then becomes, what was Mr. Goddard's motive if Mr. Parkes wasn't [supplying] it"? Parkes had an answer: Goddard "had falsified 300 loans, and . . . he

didn't want anyone to know what he had done." Rule 404(b) did not prohibit the use of Parkes's evidence for this purpose. Accordingly, the district court abused its discretion when it concluded that "this evidence does not fall within one of the[ permissible] purposes" Parkes identified.

That the evidence may also have had some improper propensity purpose does not change our analysis. When evidence could be used for both proper and improper purposes, Rule 404(b) "do[es] not flatly prohibit [its] introduction." *Huddleston v. United States*, 485 U.S. 681, 687-88 (1988). Rather, the district court must weigh the proper probative value of the evidence against, among other things, its unfairly prejudicial effect. *See* Fed. R. Evid. 403; Advisory Committee's 1974 Note to Rule 404(b) ("[I]t is anticipated that with respect to permissible uses for such evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403."). The court may then choose to exclude the evidence, admit the evidence, or admit the evidence subject to a limiting instruction. *See* Fed. R. Evid. 105, 403.

Having failed to recognize that Parkes's evidence had proper purposes, the district court never undertook a Rule 403 review. *See United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005) ("[W]henever a district judge is required to make a discretionary ruling that is subject to appellate review, we have to satisfy ourselves, before we can conclude that the judge did not abuse his discretion, that he exercised his discretion, that is, that he considered the factors relevant to that exercise."); *United States v. Herndon*, 156 F.3d 629, 634 (6th Cir. 1998) ("It is axiomatic that the district court must first have an opportunity to exercise its discretion before this court can review the same for possible abuse.").

In any event, considering the great probative value of Parkes's excluded evidence and Rule 403's preference for admissibility, the district court would have abused its discretion had it concluded that Rule 403 required the altogether exclusion of this

evidence. *See* Fed. R. Evid. 403 (excluding relevant evidence only when "its probative value is substantially outweighed" by other factors).[8]

B.

The second error is even more troubling. At the close of his rebuttal argument to the jury, the prosecutor said:

> Your Government just wants you to do what is right. And if it's right to acquit [Parkes and Mourier], you do it, you let them keep the $4 million, you tell the government, "Shame on you for persecuting these poor people."

As the district court recognized, it was improper for the prosecutor to suggest that an acquittal would allow Parkes and Mourier to "keep the $4 million." First, that suggestion was false and the government knew it. Prior to trial, Parkes had negotiated a repayment plan for the Remington loans with Benton Bank. In fact, Parkes had worked with the Bank to sort out Remington's tangled loan history and had agreed to redocument any notes. And by the trial date, Parkes apparently had already repaid the Bank some $3,200,000.

Moreover, even if Parkes had made no effort to repay the Bank, that failure would not be a reason to convict him on the counts charged in the indictment. As the *government* argued both below and in its brief to this Court, "[w]hether defendant repaid the loan was a separate question than whether he had committed fraud." Evidence of repayment (or not) was likely to distract the jury from its task in determining Parkes's guilt on the charged offenses.

The prosecutor himself had previously moved to exclude any evidence that Parkes had agreed to repay Remington's debt to Benton Bank or that Parkes had already repaid a substantial portion of the debt. In that motion, the prosecutor argued that evidence "of any payments that may have been made after the alleged scheme to defraud

---

[8]"The government bears the burden of persuading us that an error is harmless." *United States v. Locklear*, 631 F.3d 364, 369 (6th Cir. 2011). Notably, the government does not argue that this error was harmless.

was discovered . . . would be irrelevant to the issues and suggest a verdict upon an improper basis."  Apparently aware that evidence on repayment—or lack of repayment—would influence the jury, the prosecutor quoted this Court's decision in *United States v. Jones*, that "even if a jury does not have the lawful *authority* to bring in a verdict in the teeth of both law and facts, it unquestionably has the *power* to do so," 108 F.3d 668, 676 (6th Cir. 1997) (emphases in original) (citation omitted), and so "urge[d] the court to uphold the rule of law and exclude defense evidence *and arguments* that would invite the jury to decide the case on issues other than the relevant law and facts," D. Ct. Doc. 53, at 5-6 (emphasis added).

Then, during the trial, the prosecutor unfailingly objected to Parkes's repeated efforts to offer repayment evidence.  Each time the district court sustained the government's objection.  Yet incredibly, at the very end of the case, in the final words of an argument to which Parkes had no opportunity to respond, the prosecutor suggested—contrary to the very evidence the government had fought so hard to exclude—that Parkes would keep the Bank's money unless the jury found him guilty.[9]

All of which points us to one conclusion:  The prosecutor's improper remark was not only misleading and highly prejudicial, it was deliberately made.  When such remarks accompany a case as frail as this one, they are flagrant, requiring mistrial.  *See United States v. Abboud*, 438 F.3d 554, 584 (6th Cir. 2006); *United States v. Tarwater*, 308 F.3d 494, 510-11 (6th Cir. 2002).

That the prosecutor's remark was isolated does not change matters, at least in this case.  Even "a single misstep on the part of the prosecutor may be so destructive of the right to a fair trial that reversal is mandated."  *United States v. Solivan*, 937 F.2d 1146, 1150 (6th Cir. 1991) (internal quotation marks omitted); *see also United States v. Carroll*, 26 F.3d 1380, 1386 (6th Cir. 1994).  And where the other relevant factors weigh so heavily in favor of mistrial, this Court will not authorize "one free bite," particularly when the prosecutor timed the comment to exact the maximum prejudicial toll.

---

[9]Lamely, the prosecutor claims he was responding to a defense-counsel argument.  But defense counsel's argument was no more than that the government's prosecution was unfair.

Nor did the district court sufficiently cure the prosecutor's remark when it instructed the jury that

> the evidence in this case is what the witnesses testified to under oath and what's contained in the documents. The attorneys are free to say things during their arguments, but if what they say differs from the evidence, then you should follow the evidence. What the attorneys say is not evidence. They cannot present evidence. They cannot testify. They're advocates for their sides. And in determining the facts, you must base your decision solely upon the evidence that's been introduced into the court. So if you think that an attorney said something in the course of their arguments and the facts do not support it, then you should just disregard what the attorneys said.

That instruction does little to erase the prejudicial effect of the prosecutor's suggestion that the jury alone could prevent a Bank loss of four million dollars. *See Carroll*, 26 F.3d at 1389 n.12. What's more, though there was "no evidence one way or the other regarding the defendants' possession of any amounts of money," there *had* been evidence that the Bank was forced to "write off the $4 million." So for all the jury knew, the prosecutor's suggestion was true—the Bank lost four million dollars and Parkes had it.

In light of the prosecutor's serious transgression, the proper course was to declare a mistrial, not to dismiss the jury for a three-day-long weekend.

### IV.

Because the evidence was insufficient to prove Parkes's guilt beyond a reasonable doubt, we reverse Parkes's convictions and vacate his sentence. On remand, the district court should enter a judgment of acquittal.