NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0243n.06

Case Nos. 13-2612/13-2628

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Apr 03, 2015 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| HUSSEIN NAZZAL (13-2612), | ) | THE EASTERN DISTRICT OF |
| EDWARD SCHNEIDER (13-2628), | ) | MICHIGAN |
| | ) | |
| Defendants-Appellants, | ) | |
| | ) | |
| _____/ | ) | |

**Before: MERRITT, STRANCH, and DONALD, Circuit Judges.**

MERRITT, Circuit Judge. This appeal concerns two co-defendants convicted on several charges relating to a wide-ranging bank fraud conspiracy. Over several years, Hussein Nazzal and his attorney, Edward A. Schneider, conspired with others to defraud Detroit-area banks using fraudulent financial documents. They also bribed a bank officer to approve loans for unqualified third parties and took steps to conceal their crimes. The jury convicted on all counts, and each received a below-Guidelines sentence. They raise a host of issues on appeal. For the reasons explained below, we AFFIRM.

## I.     Factual & Procedural History

Nazzal was a Dearborn, Michigan businessman who facilitated bank loans for others and also made his own "hard money loans"—*i.e.*, high-interest loans to borrowers who could not otherwise obtain them.  Over a six-year period beginning in 2003, Nazzal orchestrated three wide-ranging bank fraud schemes in the metropolitan Detroit area.  To accomplish his frauds, Nazzal conspired with several people, including his attorney (co-defendant Edward Schneider), a title company vice president (co-defendant Ross Carey), and a bank loan officer who later became a witness against the defendants (co-defendant Eric Morton).  Nazzal also recruited borrowers and directed others to procure loans on his behalf.  During the conspiracy, these individuals obtained millions in fraudulent commercial loans from several banks.

### A.     *Fifth/Third Bank Frauds (Counts 1-3)*

Fifth/Third prohibited payment of broker's fees from loan proceeds.  To circumvent this prohibition, Nazzal regularly bribed loan officer (and testifying co-defendant) Eric Morton to approve loans for unqualified borrowers.  In these "straw buyer" transactions, Nazzal would then submit fraudulent payoff letters for mortgages and pre-existing liens—when none existed—so that he or one of his companies[1] could obtain payments at the respective closings.  Only some of these transactions were presented at trial as examples.  Those relevant to this appeal are discussed below and referenced by street address.

### 1.     7845 Wyoming

In this straw buyer transaction, Nazzal engineered a loan for Mountif Zeaiter, a sporadically employed and otherwise unqualified borrower.  In order to get Fifth/Third's

---

[1] Nazzal typically did business with Fifth/Third through several entities, including G&S Development and Alter Investments.  At different times, both Nazzal and Schneider claimed to be the Treasurer of G&S.  Schneider also signed documents as the Treasurer of Alter Investments.

approval for this $345,000 loan, Nazzal gave Morton false tax returns greatly inflating Zeaiter's income. Schneider prepared the paperwork and was present at the meeting when Zeaiter signed the documents. Schneider also prepared a purchase agreement (that was faxed from his law office) falsely stating that Zeaiter had given the seller $5,000 in earnest money.

Schneider was also present at the loan closing. Although the documents required Zeaiter to pay approximately $18,000 at closing, he later testified that he never paid anything. Nazzal also submitted a fraudulent payoff letter for $12,000—in reality just a disguised fee for his brokering the loan. After the closing, Nazzal paid Schneider with a $500 cashier's check and gave Morton $3,500 cash.

## 2. 8725 Livernois

Nazzal again brought a straw buyer to Morton and again obtained a "brokerage" fee at closing in violation of Fifth/Third policy. The closing on this $320,000 loan took place at Minnesota Title Agency, whose president (and co-defendant) Ross Carey later testified that Schneider was associated "whenever there was a closing involving [Nazzal]." In this deal, Schneider served as a "witness" on the purchase agreement, which falsely indicated that the borrower was making a $100,000 down payment on the property. Nazzal obtained nearly $15,000 at the closing.

## 3. 9700 & 9701 Van Dyke

Nazzal directed Morton to falsify the borrowers' financial statements for a $612,000 commercial loan secured by the 9701 property. Schneider signed a fraudulent payoff letter as the "Treasurer" of Alter Investments, falsely stating that the company had a prior mortgage on the property. This letter was faxed from Schneider's law office. At the closing, Fifth/Third paid

Alter Investments $22,000 to clear title and Schneider received $2,588 in attorney's fees. Nazzal also paid Morton over $1,000 for assisting with this transaction.

For a $550,000 loan on the 9700 property, Nazzal provided another fraudulent payoff letter for $48,000—again, where no prior lien existed. The transaction resulted in a payment of nearly $28,000 to G&S Development with an additional payment of $500 to Schneider.

### 4.      12803 Hamilton

Two brothers had fallen behind on a construction loan for a gas station. During court proceedings, they happened to meet Nazzal and Schneider, who were at the courthouse that day on another matter. The brothers eventually obtained alternate financing from Nazzal. When this loan came due, they planned to sell their gas station and pay Nazzal with the proceeds.

After the sale fell through, one owner agreed to buy the property from his brother so that Nazzal would get paid out on time. This last-minute deal also required an emergency payment to Morton, who had spent considerable time getting his superiors at Fifth/Third to approve the transaction. In advance of the closing, Schneider gave Morton a $1,000 check drawn from his law firm's trust account. Morton falsely wrote "payback previous personal loan" in the memo line of the check. He later testified unequivocally that he received this payment as a bribe.

The brothers and Nazzal disputed various payoffs and fees prior to closing. Schneider signed one fraudulent payoff letter for $549,000 as the "Treasurer" of G&S Development. The parties also disputed payment of $1,750 in purported "attorney's fees" to Schneider. Both brothers later testified that they "never hired" Schneider for the closing; they believed he represented Nazzal.

### B.        *Comerica Bank Fraud (Count 5)*

Nazzal defrauded Comerica using a so-called "lien jumping" scheme.   Hours after closing on a $1 million loan with Comerica for a gas station, co-defendant Majed Tawbe executed a fraudulent, handwritten $500,000 mortgage on the same property in Nazzal's favor. Nazzal then managed to record this bogus mortgage several days before Comerica recorded its legitimate one.   After Tawbe defaulted on his loan and fled the country, Comerica attempted to foreclose and learned of Nazzal's prior recorded lien.   Comerica and its title insurance company, First America Title, were thus required to initiate legal proceedings to quiet title.   Eventually, First America Title agreed to pay Nazzal $135,000 to release his fraudulent lien.

### C.        *Standard Federal Bank Fraud (Count 7)*

In March 2004, co-defendant Farouk Harajli obtained a $3 million loan from Standard Federal.   Because part of this loan was secured by a gas station he owned, he promised not to obtain any secondary financing on that property or borrow any additional funds without Standard Federal's consent.

Later that spring, Harajli was involved in a contested divorce and turned to Nazzal for a short-term $100,000 loan.   Because Harajli's wife co-owned most of his businesses, the court required her consent for all financial transactions—but she refused to sign off on the loan from Nazzal.   To solve this problem, Nazzal proposed to falsify a Power of Attorney permitting Harajli to sign various business documents on his wife's behalf.   Schneider prepared the document, Harajli forged his wife's signature, and Nazzal loaned him the $100,000.

When Harajli approached Nazzal for another loan, Nazzal performed a title search on Harajli's properties and discovered that Standard Federal had not recorded its $3 million

mortgage on the gas station.[2] Nazzal then took steps to drain the equity from the property by recording two bogus mortgages totaling $750,000. Schneider prepared both documents, which were notarized by his wife.

Harajli eventually defaulted on his $3 million loan from Standard Federal. When Nazzal falsely claimed to have no knowledge of this loan, Standard Federal was forced to file an action to quiet title. Under Michigan's recording statute, any prior knowledge of Standard Federal's mortgage would have been fatal to Nazzal's claim to be first in line on the property.[3] Nazzal therefore testified falsely—and also arranged for Harajli to testify falsely—that he had no knowledge of this pre-existing mortgage. In a further effort to make his claims seem legitimate, Nazzal arranged for co-defendant Carey of Minnesota Title Agency to backdate a check showing Nazzal's "prior" acquisition of a title insurance policy with respect to his bogus mortgages. Nazzal also encouraged Carey to testify falsely to the same during a deposition and at trial.

Nazzal eventually prevailed in the quiet title suit and was awarded $750,000— undoubtedly due to the perjured testimony. Between paying the judgment and attorney's fees, Standard Federal Bank (by then Bank of America) and its commercial title company lost nearly $1 million.

### D.      *Falsification of Records (Count 8)*

Nazzal also engaged in several activities to avoid discovery. Eric Morton testified that when Nazzal feared their scheme would be uncovered, Nazzal told him they had "to keep [their] stories straight . . . that [Morton] was not bribed, [and that] the loans were above board . . . things along that line." Nazzal similarly directed both Morton and Farouk Harajli to create affidavits

---

[2] Due to the death of the title company's closing agent, there had been a delay in recording a number of documents, including the $3 million Standard Federal mortgage on Harajli's gas station.

[3] Under Michigan's "race-notice" recording statute, a party who records first gets priority of title only if they also lacked notice of any prior unrecorded claims on the same property. *See* Mich. Comp. Laws § 565.29.

and other documents falsely exonerating Nazzal from any wrongdoing. FBI agents recovered these papers along with many of the false tax returns used in the bank fraud schemes in a safe at Nazzal's house during the execution of a search warrant. Co-defendant Carey later testified that after the execution of this warrant, Nazzal told him to lie in order "to keep [their] stories straight."

Schneider also played a role in the cover-up. At least three of Morton's false written statements were notarized by employees at Schneider's law office. Despite Schneider's $1,000 payment to Morton in connection with the 12803 Hamilton transaction, these documents falsely stated that Morton had never been bribed by Nazzal or any other person. Additionally, Schneider later told an FBI agent that he had never been an officer or partner of any of Nazzal's companies—even though he had signed two fraudulent payoff letters as "Treasurer."

### E.    *Convictions & Sentencing*

The jury convicted Nazzal on all indicted counts:  conspiracy to defraud Fifth/Third, Comerica, and Standard Federal in violation of 18 U.S.C. § 1349 (Counts 1, 5, and 7); bank fraud against Fifth/Third in violation of 18 U.S.C. § 1344 (Count 2); corruptly giving Fifth/Third employee Eric Morton money in connection with bank transactions in violation of 18 U.S.C. § 215 (Count 3); and falsification of records in a federal investigation in violation of 18 U.S.C. § 1519 (Count 8). He received a below-Guidelines sentence of 110 months.

The jury also convicted Schneider on Counts 1 and 7. As to Count 3, the jury found him guilty of the lesser-included offense of making an illegal payment of only $1,000 (for his payment to Morton in connection with the 12803 Hamilton transaction). He received a below-Guidelines sentence of 48 months.

## II.   Analysis

### A.   *Juror Notes*

Nazzal and Schneider first take issue with two notes submitted by the jury during trial. The first expressed confusion about the prosecution and defense teams working together in presenting certain exhibits.  The second stated:  "I have many questions concerning legal terms and laws.  During deliberations, will we have someone available to answer these types of questions?"  Nazzal and Schneider claim these notes demonstrate that the jury lacked impartiality or conducted premature deliberations and thus deprived them of a fair trial in violation of the Sixth Amendment.

Their argument fails because the district court addressed both notes and issued curative instructions with both Nazzal and Schneider's blessing.  As to the first note, the court explained the benefits of professionalism and that it had directed the sides to cooperate with each other in presenting certain documentary evidence.  Concerning the second note, the court informed the jury that it would have the opportunity to ask legal questions during deliberations.  Both Nazzal and Schneider expressly agreed with these instructions; they neither objected nor moved for a mistrial.  Accordingly, we find no Sixth Amendment violation. *See United States v. Perry*, 438 F.3d 642, 651 (6th Cir. 2006).

Nazzal and Schneider further argue that the district court should have conducted a *Remmer* hearing to address any possibility of a biased jury. *See Remmer v. United States*, 347 U.S. 227, 229 (1954) ("In a criminal case, any private communication, contact or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, presumptively prejudicial.").  A *Remmer* hearing, however, is only required in cases involving actual outside or improper contact with jurors or extraneous information

contaminating the deliberation process.  *See United States v. Ford*, 761 F.3d 641, 654-55 (6th Cir. 2014).  There were no such influences here.

### B.      Schneider's Convictions

### 1.      Conspiracy to Defraud Fifth/Third Bank (Count 1)

Schneider contends that the evidence presented at trial was insufficient to convict him of conspiracy to defraud Fifth/Third Bank.  He asserts that Nazzal and Morton were the real perpetrators, that he was "merely present" as an innocent bystander at many of the relevant conversations (some of which took place in Arabic, which he does not speak), and that there was no real evidence that he knew of or participated in their scheme.

A conviction for bank fraud under 18 U.S.C. § 1344 requires three elements:   "(1) that the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution; (2) that the defendant did so with the intent to defraud; and (3) that the financial institution was insured by the FDIC."  *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001) (citation omitted).  We will reverse such a conviction "only, if viewing the record as a whole, the judgment is not supported by substantial and competent evidence."  *Id.*

The thrust of Schneider's argument is that the evidence failed to prove his intent to defraud and his knowing participation in Nazzal's conspiracy.  He relies heavily on *United States v. Parkes*, 668 F.3d 295 (6th Cir. 2012), for the proposition that the jury incorrectly inferred his intent to defraud.  In *Parkes*, however, the only real evidence against the defendant was a single faxed email, *id.* at 301, and our decision to reverse was bolstered by a finding of prosecutorial misconduct.  *Id.* at 306.  This case is different.  Because the evidence against Schneider is more substantial, his reliance on *Parkes* is unpersuasive.

We believe *United States v. Davis*, 490 F.3d 541 (6th Cir. 2007), is more illuminating. In that case, we affirmed a conviction for a fraud scheme perpetrated mainly by the defendant's wife. *Id.* at 548-50. Like Schneider, Davis argued that no evidence indicated he knew that certain documents were fraudulent. *Id.* at 549-50. Also like Schneider, Davis claimed he was an innocent bystander and blamed everything on his co-defendant, whose fraudulent actions had "dominated" the trial. *Id.* at 549. Nonetheless, we affirmed Davis's conviction because evidence of the repeated occurrence of fraudulent activities and his participation in the destruction of evidence proved that he possessed the requisite knowledge and intent. *Id.* at 550. Thus, a lead defendant's participation in a scheme to defraud does not negate another defendant's involvement with it. *Id.*

As in *Davis*, the record here contains substantial circumstantial evidence pointing to Schneider's guilt—certainly more than enough for a rational trier of fact to have inferred his knowledge of and intent to participate in Nazzal's scheme. Schneider prepared many of the fraudulent documents used, some of which were notarized by his employees and faxed from his law office. Many of the closings and negotiations also took place there. *See Davis*, 490 F.3d at 548-50 (permitting an inference of knowing participation from repeated fraudulent transactions occurring at defendant's home). Moreover, Schneider signed two of Nazzal's fraudulent payoff letters as "Treasurer" of Nazzal's companies—despite later telling the FBI that he had never been an officer in any of them. *See id.* at 550 ("[T]he record contains testimony . . . that implicates Mr. Davis in cover-up operations to destroy evidence, from which the jury could infer that he sought to conceal his own wrongful acts."). Viewed in the light most favorable to the prosecution, this circumstantial proof is more than sufficient to support Schneider's conviction as to Count 1, because "'[i]ntent to defraud can be proven by circumstantial evidence and by

inferences drawn from the scheme itself.'" *United States v. Isaiah*, 434 F.3d 513, 519-20 (6th Cir. 2006) (quoting *United States v. Ryan*, 213 F.3d 347, 350 (7th Cir. 2000)).

## 2.    Bribery of Bank Official (Count 3)

Schneider also argues that the trial evidence was insufficient to convict him of bribing Fifth/Third employee Eric Morton.[4]   The basis of this conviction was the $1,000 check drawn from Schneider's law firm's trust account paid to Morton in advance of the 12803 Hamilton closing.  At trial, Morton testified unequivocally that he received this payment as "a bribe" to ensure funding after the original buyer backed out of the deal.  On appeal, Schneider contends that there was no evidence at trial indicating that he ever knew the purpose of this payment.  The issue is again one of knowledge and intent.

*Davis* is illuminating here as well.  There, a witness testified to forging signatures at the lead defendant's direction and also recalled that Davis "'came in and out that day.'"  *Davis*, 490 F.3d at 550.  Davis's mere presence at the location was a critical fact:   "[t]he record provided ample support for the jury to make the inference that Mr. Davis had the requisite knowledge and fraudulent intent to be a participant in the scheme, by virtue of the repeated occurrence of fraudulent activities, spearheaded by his wife, at his place of business and his home." *Id.* at 549.

We again find that the circumstantial evidence supports the inference that Schneider had knowledge of the bribery.  Like the witness in *Davis*, Schneider was "in and out" of the conversations relating to the 12803 Hamilton transaction—because they took place at his law office.  Schneider was also involved in other aspects of the 12803 Hamilton deal.  He was present in court the day Nazzal met the property owners and he signed a fraudulent payoff letter

---

[4] 18 U.S.C. § 215(a)(1) criminalizes the actions of anyone who "corruptly gives, offers, or promises anything of value to any person, with intent to influence or reward an officer, director, employee, agent, or attorney of a financial institution in connection with any business transaction of such institution."

as the "Treasurer" of G&S Development. The jury is the trier of facts, and it could reasonably infer knowledge from Schneider's frequent participation in drafting documents relating to fraud.

### 3. Variance/Constructive Amendment of Indictment (Count 7)

Schneider contends that his trial was tainted by a constructive amendment to—or, alternatively, a fatal variance from—the superseding indictment when the Government presented evidence purportedly outside the scope of the crimes charged. Count 7 erroneously alleged that the conspiracy to defraud Standard Federal began in December 2005 when it actually started in May 2004. The Government concedes that the date range stated in the indictment is incorrect, ascribing it to a drafting error, and that the indictment should have alleged a conspiracy ranging from May 2004 to September 2009. Because of this clerical error, the only evidence presented as to Schneider's actions on Count 7 predated the dates alleged in the indictment by 11 months. In a well-reasoned order, the district court denied Schneider's motion for judgment of acquittal by finding that this date discrepancy only amounted to a harmless variance of no consequence. We agree.

Fed. R. Crim. P. 52(a) requires us to disregard "[a]ny error, defect, irregularity or variance that does not affect substantial rights." A variance affects substantial rights "only when a defendant proves prejudice to his ability to defend himself or to the overall fairness of the trial." *United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998). Schneider fails to show such prejudice. The date discrepancy was a clerical error readily apparent from the face of the indictment. He had ample notice of the conduct that formed the charged offense. Additionally, the district court instructed the jury that Schneider was charged with conspiracy to defraud Standard Federal some time beginning in December 2005, but that the Government only had to prove that the crimes happened reasonably close to that date. These instructions were proper

because the beginning and end dates of a conspiracy are not essential elements of the charged offense. *See United States v. Warshak*, 631 F.3d 266, 309 (6th Cir. 2010) ("the temporal scope of a conspiracy is not an 'essential' or 'material' element of the charge") (internal quotations and citations omitted).

### C.   Intended Loss Enhancement—U.S.S.G. § 2B1.1(b)(1)(J)

Nazzal and Schneider both argue that the district court erred in applying an 18-level enhancement under U.S.S.G. § 2B1.1(b)(1)(J) after finding that they intended to obtain more than $2.5 million from their conspiracy to defraud. We review a district court's loss calculations for clear error. *United States v. Poulsen*, 655 F.3d 492, 512 (6th Cir. 2011).

### 1.   Nazzal's Losses

Nazzal incorrectly argues that his loss calculation was "purely speculative" because it was based upon facts that were not part of the record. Prior to the sentencing hearing, the Government submitted charts with two possible loss calculations. The first contained all Fifth/Third loans that might be considered relevant conduct as to Nazzal. The second detailed only those losses stemming from the six transactions explicitly discussed at trial. At Nazzal's request, the district court limited its calculation of the Fifth/Third losses to only the second chart—*i.e.*, those transactions that were specifically discussed at trial. Accordingly, the court attributed approximately $3 million in intended loss to Nazzal as follows:   nearly $1.9 million for the various Fifth/Third frauds, $130,000 for the Comerica fraud, and $960,000 for the Standard Federal fraud.[5]   We see no error.

---

[5] Although the loans from Fifth/Third totaled $3,150,000.00, the Government offered $1,259,915.58 in offset credits favoring the defendants—a net loss of $1,890,084.12. There was no reduction for the sale or value of collateral for the lien jumping conspiracies against Standard Federal ($750,000) or Comerica ($130,000), which represented nothing more than theft of funds through the use of false documents, false testimony, and false litigation.

**2.      Schneider's Losses**

Schneider argues that the district court incorrectly tagged him with the entire loss caused by the Fifth/Third[6] conspiracy without making the requisite findings under *United States v. Campbell*, 279 F.3d 392 (6th Cir. 2002).    Under *Campbell*, when holding a defendant accountable for the actions of a co-conspirator's relevant conduct,[7] a district court must make "particularized" findings:   "(1) that the acts were within the scope of the defendant's agreement; and (2) that they were foreseeable to the defendant." *Id.* at 399-400 (citation omitted).  "In order to determine the scope of the defendant's agreement, the district court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." *Id.* at 400 (quoting U.S.S.G. § 1B1.3, app. n.2).  Whether a defendant can be held accountable for a co-conspirator's conduct is a factual determination we review for clear error. *Id.* at 398.

Schneider essentially argues that he could not have foreseen the "entire" loss because he only participated in some of Nazzal's Fifth/Third frauds.  The district court, however, properly attributed all Fifth/Third losses to both Nazzal and Schneider because these losses were procured as part of the overarching conspiracy.  Schneider prepared numerous documents associated with these frauds, discussions of which frequently took place at his law office.  He signed fraudulent payoff letters related to these frauds as the "Treasurer" of both Alter Investments and G&S Development.  Testimony also revealed that Schneider was present at nearly all of Nazzal's closings.  There was no error here.

---

[6] Because we affirm Schneider's conviction as to Count 7 (the Standard Federal lien jump), we need not consider his argument that he should not be held accountable for those losses.

[7] U.S.S.G. § 1B1.3(a)(1)(B) defines "relevant conduct" in the case of a jointly undertaken criminal activity as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."

### D.    Nazzal's Remaining Issues

**1.    Organizer/Leader Enhancement—U.S.S.G. § 3B1.1**

The Sentencing Guidelines provide for a 4-level enhancement "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  U.S.S.G. § 3B1.1(a).  Nazzal argues mistakenly that the district court abused its discretion in applying this enhancement because he neither "recruited," "controlled," nor issued "orders" to anyone, and all of his co-defendants or associates were "independent operators."  The district court found that Nazzal directed at least six others in his various schemes including his attorney (Schneider), a bank loan officer (Morton), a title company representative (Carey), and several other associates (Tawbe, Zeaiter, and Harajli), and several witnesses explicitly testified as to Nazzal's leadership role.  We find no abuse of discretion in the application of the enhancement.

**2.    Obstruction of Justice Enhancement—U.S.S.G. § 3C1.1**

The district court applied this 2-level enhancement based on a conversation in which Nazzal told co-defendant Carey that they had "to keep [their] stories straight" to avoid detection.  Nazzal argues that he was convicted on Count 8 for precisely the same conduct now being used as the basis for this enhancement.  Nazzal's falsification-of-records conviction on Count 8, however, stemmed from his obtaining written statements from co-defendant Morton—not Carey—in which Morton falsely denied receiving bribes.  Nazzal's statement to Carey thus provides a separate and independent basis for the obstruction of justice enhancement.  *See United States v. Stafford*, 639 F.3d 270, 275-76 (6th Cir. 2011) (affirming a § 3C1.1 obstruction enhancement where a defendant told a witness "we can't say anything, we have got to stick together").

**3.      § 3553(a) Factors**

Nazzal contends that the district court "ignored" relevant § 3553(a) factors because it did not expressly mention his age or health when calculating his below-Guidelines sentence. Nazzal was 59 years old at sentencing and his medical problems were not unusual for a man of his age and activity level. The record also indicates that the district court sufficiently discussed the other relevant § 3553(a) factors at sentencing. For example, the court expressly noted its obligation to "impose a sentence that is sufficient, but not greater than necessary to provide a just punishment and impose a sentence that will promote respect for the law, taking into account the nature of the offense and the circumstances of the offender." The court received and considered a number of letters in Nazzal's support, but noted that the kind picture they painted conflicted with the evidence presented at trial. The court discussed Nazzal's criminal record, the fact that he recruited and encouraged others in his conspiracy, the "extensive loss" in the case, and the need to promote respect for the law and deterrence. The record also shows a careful consideration of Nazzal's personal characteristics.

**4.      Motion for Judgment of Acquittal  (Count 8)**

At the close of the Government's proofs, Nazzal made a Rule 29 motion for judgment of acquittal with respect to Count 8. The district court took the motion under advisement and sent the count to the jury. After the guilty verdicts, the court noted that Nazzal's motion was still under advisement and invited briefing. Nazzal did not file a brief as to this motion, nor does the record contain a ruling on it.

Nazzal now claims that his conviction should be reversed because the district court failed to rule on his motion. We hold that Nazzal effectively withdrew his Rule 29 motion as to Count

by declining the court's invitation to file a brief, failing to request a ruling on the motion at sentencing, and proceeding through the sentencing hearing without objection.

### III.     Conclusion

For the foregoing reasons, we AFFIRM all convictions and sentences.